ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
DAVID R. ZARO (BAR NO. 124334)
MATTHEW D. PHAM (BAR NO. 287704)
865 South Figueroa Street, Suite 2800
Los Angeles, California 90017-2543
Phone: (213) 622-5555
Fax: (213) 620-8816
Email: dzaro@allenmatkins.com
mpham@allenmatkins.com

ALLEN MATKINS LECK GAMBLE
MALLORY & NATSIS LLP
EDWARD G. FATES (BAR NO. 227809)
One America Plaza
600 West Broadway, 27th Floor
San Diego, California 92101-0903
Phone: (619) 233-1155
Fax: (619) 233-1158
Email: tfates@allenmatkins.com

Attorneys for Plaintiff
KRISTA FREITAG, Receiver

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

KRISTA FREITAG, court-appointed receiver,

Plaintiff,

v.

MURCHISON & CUMMING, LLP,

Defendant.

Case No. 2:26-cv-7077

**RECEIVER'S COMPLAINT FOR**

**(1) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY,**
**(2)AIDING AND ABETTING FRAUD,**
**(3) CIVIL CONSPIRACY,**
**(4) MALPRACTICE,**
**(5) AVOIDANCE AND RECOVERY OF ACTUAL FRAUDULENT TRANSFERS, AND**
**(6) AVOIDANCE AND RECOVERY OF CONSTRUCTIVELY FRAUDULENT TRANSFERS**

/ / /

/ / /

Plaintiff KRISTA FREITAG (the "Receiver" or "Plaintiff"), in her capacity as receiver for the Receivership Entities (as defined below), hereby brings this complaint (the "Complaint") against defendant MURCHISON & CUMMING, LLP ("Murchison" or "Defendant"). In support of the Complaint, Plaintiff alleges as follows:

## I. PRELIMINARY STATEMENT

The Receiver, as receiver for the Receivership Entities formerly used by certain individuals to perpetrate an alleged Ponzi scheme on innocent investors, has the authority to pursue claims held by those Receivership Entities, including any claims against those who aided and abetted or otherwise furthered the scheme, conspired with or assisted the perpetrators of the scheme, or received fraudulently transferred assets. The Receiver now does so by prosecuting this Complaint against Murchison.

In or about 2022, when INR, one of the Receivership Entities, was experiencing difficulties making its monthly payments to its investors (as a result of operating a Ponzi scheme and having no legitimate business operations), INR sought to retain legal counsel, ostensibly to advise on its options for restructuring its investor contracts and pursuing a securities offering to raise additional capital. In reality, INR needed a law firm to help it appear legitimate in the eyes of investors and avoid detection of its fraud for as long as possible, so that the perpetrators of the scheme could keep the already duped investors at bay and continue stealing huge sums from new investors.

INR then found John Ryan Flanagan, a junior litigation associate with only about a year of experience as an attorney, and later retained his law firm Murchison as counsel (after Flanagan brought INR over as a client from his prior firm). Once Murchison, an otherwise litigation-focused law firm, was retained, the firm inexplicably allowed Flanagan to handle INR's transactional matter completely on his own—without any supervision from a more senior or experienced attorney—

despite partners being aware that Flanagan, who had just arrived at the firm less than a month prior, was only a junior-level litigation attorney with no familiarity or experience in securities law, the restructuring of investor contracts, or equity offerings. In the end, over a one-year period, Flanagan billed hundreds of hours to the INR matter (while no partners ever billed any time thereto), and Murchison collected hundreds of thousands of dollars from INR on account of the firm's work for it, while also rewarding Flanagan with quarterly bonuses for bringing in a seemingly lucrative client to the firm. On top of that, during this time, Flanagan further enriched himself by accepting side payments (i.e., bribes or kickbacks) directly from INR in exchange for his complicity in assisting INR in furthering the scheme.

During the course of Murchison's representation of INR, a myriad of serious red flags came to light concerning INR's purported business and the conduct of its principals. Indeed, Flanagan became aware of, among other things, (a) INR's past and continuing misrepresentations to investors about its financial condition (including the misrepresentation that it owned cannabis facilities), (b) its vehement resistance to putting its purported major contracts in writing and continued insistence in relying on "handshake deals" (e.g., the purported leases for its cannabis facilities), (c) its disorganized and sometimes inaccurate recordkeeping for investors and their investments, (d) its false and nonsensical financial statements (which, among other things, completely omitted its obligations to repay investors from its debts), (e) its willingness to give investors financially irrational "sweetheart deals" to buy their silence, (f) investors' inability to find any information about the company or its principals on the internet, (g) the various fraud-related allegations leveled against it by multiple attorneys, and (h) INR's principal's use of a different name or alias in non-INR-related matters. Indeed, Flanagan's early text messages, in which he mentioned a news article about another Ponzi scheme and expressed his concern that the story sounded similar to INR's,

suggest that he was aware near the start that INR did not have a legitimate operation. Yet, at each juncture, Flanagan chose not to ask questions and, with no supervision or oversight from more senior Murchison attorneys, was instead able to ignore apparent problems and simply forge ahead with whatever INR's principals asked of him.

Despite having no securities law experience, Flanagan proceeded to fully immerse himself in the drafting process of the Offering Documents that were used in INR's purported equity offering and given to investors. While Dickinson Wright, a national full-service law firm with expertise in securities law matters, handled preparing the initial drafts of the Offering Documents, Flanagan thereafter substantively revised and finalized this set of documents nearly on his own. His revisions to the Offering Documents added, deleted, or otherwise changed the substantive provisions therein, which included (a) modifying the terms of INR's proposed offering (e.g., the number of shares being offered and their par value), (b) changing how preferred stock converted to common stock, (c) deleting the provision granting voting rights to holders of Series A preferred stock, (d) creating a new class of Series B preferred stock, (e) changing how the dividend for preferred stock was calculated, and (f) removing the risk-factors discussion about how INR may not pay dividends out to investors. And Flanagan made these revisions without more senior or qualified attorneys having reviewed his drafts before they were disseminated to investors. Indeed, not only were Murchison attorneys absent, but Flanagan also intentionally excluded Dickinson Wright's experienced securities attorneys from the editing process as well, knowing that their involvement would prevent the documents from being finalized and getting out to investors. In the end, due to Flanagan's actions, those attorneys never saw the (significantly flawed) final versions of the Offering Documents before they ended up in the hands of investors.

Unsurprisingly, the Offering Documents were highly problematic, containing false and misleading and sometimes internally inconsistent information—which

was known to Flanagan—and also omitting critical information that would otherwise be disclosed in a legitimate securities offering. Nevertheless, Flanagan, while again ignoring the various red flags surrounding INR and its investment program, allowed the Offering Documents to be sent out to investors over a six-month period (sometimes sending the documents to investors himself) and, in connection with the dissemination of those documents, also sometimes acted as INR's spokesperson by reassuring reluctant or suspicious investors that INR was offering them a legitimate investment opportunity or that their questions about the potential impropriety of INR's finances were unfounded. And Flanagan could do so because Murchison had completely abdicated its responsibility of supervising a junior associate working on a matter outside of his practice.

Murchison's role in assisting INR, including in preparing and disseminating the Offering Documents, ultimately allowed the scheme to continue on unabated and, as a result, caused deeper investor losses therefrom. First, some investors who received the Offering Documents—who were either new investors (who had not yet contributed funds to INR) or existing investors (who had previously contributed funds to INR)—were, in reliance on the Offering Documents, persuaded to invest new funds into INR. Not only were these investors being presented with a set of papers that were professionally prepared by a law firm and looked like real legal documents, but they were further convinced of INR's legitimacy by reassurances made by Flanagan himself about INR and the fact that INR was being represented by a well-established and reputable law firm. However, it all turned out to be a fraud that was aided and abetted by Murchison.

Second, with many of the existing investors agreeing to sign the Offering Documents and forego receiving their monthly interest payments from INR under their original investor contracts—thereby putting INR's then-pressing liquidity issues on hold—the perpetrators of the scheme were able to shift their attention back to defrauding, and soliciting more funds from, new investors. In other words,

had Murchison not been involved in handling and appeasing INR's existing investors, INR would have been unable to keep the investors at bay, and those investors' ever-increasing demands for their monthly interest payments would have overwhelmed INR and inevitably led to a much earlier collapse of the scheme. Instead, Murchison's involvement gave INR's principals the time and breathing room they needed to steal tens of millions of dollars more from new investors, who ultimately suffered losses totaling more than $21.1 million. The Receiver now seeks to recover that amount of losses from Murchison for its critical role in furthering INR's fraudulent investment scheme.

## II. PARTIES

1. Plaintiff KRISTA FREITAG is the duly appointed permanent receiver for (a) Integrated National Resources, Inc., d/b/a WeedGenics; (b) West Coast Development LLC; (c) INR Consulting LLC, a Wyoming limited liability company; (d) Oceans 19 Inc.; (e) Autobahn Performance LLC; (f) One Click General Media Inc.; (g) Opus Collective; (h) Total Solution Construction LLC; (i) Bagpipe Holdings LLC; (j) Bagpipe Multimedia LLC; (k) INR Consulting LLC, a California limited liability company; (*l*) Hidden Springs Holdings Group LLC; (m) INR-CA Investment Holdings, LLC; and (n) the subsidiaries and affiliates of each of the foregoing (collectively, the "Receivership Entities"), pursuant to several orders (collectively, the "Receivership Orders") entered by the U.S. District Court for the Central District of California (the "District Court") from June 2 to 29, 2023, in the civil action styled as *SEC v. Integrated National Resources, Inc., et al.* (Case No. 8:23-cv-00855-JWH-KES) (the "SEC Action"). Among other things, the Receivership Orders call for the Receiver to recover and marshal, for the benefit of creditors of and investors in the Receivership Entities, any and all assets which were owned, leased, occupied, or otherwise controlled by the Receivership Entities or were otherwise purchased with assets of the Receivership Entities. The Receiver holds exclusive authority and control over the assets of the Receivership Entities,

including over the claims for relief alleged herein, over which this Court has jurisdiction.

2. On information and belief, defendant MURCHISON & CUMMING, LLP is, and at all times mentioned herein was, a limited liability partnership authorized to do business in the States of California and Nevada, with its principal place of business in Los Angeles, Los Angeles County, State of California.

## III. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1367(a), and the doctrines of ancillary and supplemental jurisdiction, in that this action arises from a common nucleus of operative facts as, and is substantially related to the original claims in, the SEC Action pending before the Court.

4. This Court may exercise personal jurisdiction over Defendant pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 754 and 1692.

5. Venue in the Central District of California is proper under 28 U.S.C. § 1391 because this action is an ancillary proceeding to the SEC Action and because the Receiver was appointed in this District pursuant to the Receivership Orders entered by this Court in the SEC Action.

## IV. GENERAL ALLEGATIONS

### A. The Purported Business of the Receivership Entities.

6. On information and belief, throughout the pendency of the scheme described herein (the "Scheme"), a number of individuals (collectively, the "Scheme Principals")—including, without limitation, (a) Rolf Hirschmann, who used the alias "Max Bergman" ("Hirschmann"), (b) Patrick Earl Williams ("Williams"), (c) an unidentified individual who used the alias "Michael Garcia" or "Mike Garcia" ("Garcia"), (d) an unidentified individual who used the alias "Robert Nash" or "Bob Nash" ("Nash"), and (e) an unidentified individual who used the

alias "Michael Benton" ("Benton")—were principals of and exercised control over the Receivership Entities. In a document titled *Offering Memorandum* (the "Offering Memorandum"), which was created in or about 2021 and was provided to potential investors by Integrated National Resources, Inc. ("INR"), one of the Receivership Entities, Garcia was identified as its "chief executive officer," Williams as its "vice president," Hirschmann (as Max Bergmann) as "investor relations," Nash as its "general manager," and Benton as "grow facility operations."

7. Beginning in or about August 2022, Alexandria Porter Bovee, who used the alias "Aia Montgomery" ("Bovee"), also acted as an agent or representative of INR in connection with the Scheme.

8. The Scheme Principals raised funds from investors by claiming to offer them an investment opportunity, whereby investors would (a) provide funds to be used to expand the Receivership Entities' cannabis operations and (b) in exchange, receive a substantial return on their funds. In soliciting investors, the Scheme Principals represented to investors that their funds would be deployed in developing and expanding existing or new cannabis facilities owned or operated by the Receivership Entities and located in Las Vegas, Nevada; Adelanto, California; and Oklahoma. The Scheme Principals claimed that the development and expansion of these existing or new facilities would generate enough revenue to support regular interest payments to the investors, that the facilities were profitable and making millions of dollars in revenue each year, and that the investments were both stable and guaranteed. The Scheme Principals also represented that they had the requisite licenses and permits to operate those facilities.

9. In truth, what was represented to investors was all a sham. The Receivership Entities did not own or operate any cannabis facilities. The Receivership Entities did not hold any cannabis-related licenses or permits. The Receivership Entities did not engage in any kind of cannabis-related operations.

There was no legitimate cannabis-related business, and investor funds represented the sole source of revenue for the Scheme.

10. In the end, investors paid approximately $62.8 million into the Scheme in the aggregate, and those funds were primarily used to pay existing investors and to personally enrich the Scheme Principals and others. Investors who paid money into the Scheme have collectively suffered net losses (calculated on a money-in, money-out basis) totaling approximately $44.7 million. On information and belief, for the losing investors who originally paid money into the Scheme no earlier than September 4, 2022, their net losses totaled approximately $21.1 million.

11. On information and belief, until sometime in 2022, for each transaction with an investor, originally West Coast Development LLC ("WCD"), another one of the Receivership Entities, and later INR, as WCD's purported successor, had the investor enter into a written agreement titled *Investor Agreement* (an "Investor Agreement") that was structured similarly to a promissory note. Under an Investor Agreement, the investor agreed to invest a certain principal amount into WCD or INR, as applicable, and WCD or INR, as applicable, agreed to repay that principal amount with interest (at a significantly above-market interest rate), paid in monthly installments to the investor. On information and belief, sometimes WCD or INR, as applicable, "sweetened" the investment opportunity by artificially "contributing" an additional amount for the investor's benefit, such that the investor's principal balance was more than the amounts of funds that the investor had actually contributed themselves.

12. On information and belief, in the event that an investor agreed to invest additional funds or wished to withdraw the funds from the investment, WCD or INR, as applicable, had the investor enter into another written agreement titled *Investor Agreement Addendum* (an "Investor Agreement Addendum" or "Investor Agreement Addenda"), which was structured similarly to the Investor Agreement, but updated the outstanding principal balance and adjusted the payment terms. On



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

information and belief, sometimes an investor would enter into multiple Investor Agreement Addenda. The Investor Agreement and Investor Agreement Addenda are referred to herein collectively as the "Original Investor Agreements" and individually as an "Original Investor Agreement."

13. On information and belief, an Original Investor Agreement also sometimes included a provision that the investor would receive an additional payment in the event that WCD or INR, as applicable, sold one of its cannabis facilities, which stated, "In the event of sale of Adelanto facility, Investor shall be awarded a closing settlement payment equal to [an enumerated percentage] of gross business sale amount, less 10% Broker fees."

**B. Attorneys John Ryan Flanagan and Kevin Everage.**

14. John Ryan Flanagan ("Flanagan") graduated from law school in or about May 2020 and became a Nevada-licensed attorney in or about October 2020.

15. Flanagan was employed as an associate at the law firm Smith & Shapiro, PLLC ("Smith & Shapiro") from approximately August 2021 to May 2022 and was then employed as an associate at Murchison in its Las Vegas office from approximately May 2022 to April 2024. Flanagan was hired to do business litigation at Smith & Shapiro, and while there, he worked on more litigation matters than he did transactional ones. At Murchison, Flanagan was hired to be a litigator, and he worked on insurance defense matters, as well as a few simple transactional matters (such as corporate formations).

16. On information and belief, Flanagan was a law school classmate of and, since law school, has been a close friend of Kevin Everage ("Everage").

17. On information and belief, Everage graduated from law school in or about May 2021 and became a Nevada-licensed attorney in or about October 2021.

18. Everage was employed as an associate at the law firm Dickinson Wright PLLC ("Dickinson Wright") in its Las Vegas office from approximately February 2022 to November 2024 and has been employed as of counsel at

Dickinson Wright since approximately November 2024. On information and belief, Everage characterizes himself as an intellectual property attorney and is part of Dickinson Wright's intellectual property and sports and entertainment practice groups.

**C. INR's Retention of Law Firms, Including Murchison.**

19. On information and belief, in or about 2021, INR began having liquidity issues that made it difficult for it to continue making the monthly payments due to investors under their respective Original Investor Agreements, and, as a result, INR looked to hire a law firm, ostensibly to restructure those agreements in order to reduce or avoid its contractual payment obligations to existing investors, as well as to pursue an equity offering to raise additional capital from new investors. As noted above, on information and belief, in reality, the Scheme Principals needed a law firm to help make INR look legitimate to investors whom it could not pay and to help the Scheme Principals avoid detection of the fraud for as long as possible.

20. On information and belief, in or about late 2021, Garcia, on behalf of INR, reached out to Smith & Shapiro and communicated with Flanagan to inquire whether the firm could represent INR in renegotiating the Original Investor Agreements, and Smith & Shapiro ultimately agreed to the representation. On information and belief, after reviewing the Original Investor Agreements and other materials provided by INR, Smith & Shapiro subsequently determined that the representation of INR implicated securities law and other areas of law that the firm lacked expertise in and that, as a result, the firm could not continue handling the matter on its own. On information and belief, in or about early 2022, Smith & Shapiro, including Flanagan, and Garcia discussed the various issues with the firm's representation of INR. On information and belief, following that discussion, on or about February 24, 2022, Flanagan sent a follow-up email to Garcia, in which he stated the following:

Here's an outline from our discussion:

- The contracts implicate several issues in different areas of law which Smith & Shapiro are not experts in.
- The ambiguity in the contract and the memo concerning the ownership of the Adelanto facility.
- What you described to me on the phone as the fixtures, improvement, and equipment of the Adelanto facility is what's called Tenant Improvements, however, the contract does not specify this and instead states "sale of Adelanto facility" this may be interpreted by a Court as fraud to the investor.
- This mistake of language in the contract formation is compounded because of no SEC disclosures. The SEC requires disclosures unless you have an exemption.
- These issues are the type that can catch the eye of the state Attorney General's office. Unlike other states, Nevada has codified federal securities law into state law, so this maybe the type of investor transaction the NV AG is look [sic] for.
- Even if you BK, an investor may still bring the contracts to the attention of the state's AG office, which could open a criminal investigation.
- It is my recommendation that you retain a team of attorneys consisting of securities attorney, a criminal attorney and a BK attorney, or a big shop that has all these attorneys in house. Once all the areas of law have been consulted by attorneys knowledgeable in that field, a plan of action can be recommended.
- Once the path forward is clear, I can help you with any of the Business law/litigation matters.

…

As we discussed, I don't want to start any substantive work until we have a team that includes a securities attorney, a bankruptcy attorney, and a criminal attorney and we have a chance to sit down and discuss the situation thoroughly before deciding on a plan of action. If you choose to use a firm that can help with all of them (or most of them), I completely understand.

21. Smith & Shapiro referred INR to various other law firms, including Dickinson Wright. On information and belief, Flanagan specifically referred INR to Dickinson Wright due to his existing friendship with Everage and because Flanagan was aware that Dickinson Wright was a national full-service law firm that handled securities law matters (though Flanagan knew that Everage himself was not

a securities attorney). In his February 24, 2022, email to Garcia, Flanagan provided a list of the law firm referrals to INR and specifically listed Everage as the contact for Dickinson Wright.

22. On information and belief, while INR did ultimately retain Dickinson Wright as its counsel to advise on securities law issues, Smith & Shapiro continued to be retained to handle general business law matters for INR. However, on information and belief, after Flanagan left Smith & Shapiro and joined Murchison in or about May 2022, INR elected to follow Flanagan and then retained Murchison in place of Smith & Shapiro. Accordingly, beginning in or about May 2022, INR was concurrently retaining Dickinson Wright and Murchison as counsel.

23. On information and belief, Dickinson Wright was retained by INR from approximately March 2022 to February 2023. During Dickinson Wright's representation of INR, a number of attorneys at the firm worked on INR's matters, including, without limitation, (a) Everage, a then-associate in the intellectual property practice group but the relationship attorney who brought in INR as a client to the firm; (b) Scot Crow ("Crow"), a member in the corporate and securities practice groups; (c) Frank Borger Gilligan ("Gilligan"), a then-of counsel and now member in the corporate and securities practice groups; (d) Venroy July ("July"), a member in the corporate practice group; (e) Brian Irvine ("Irvine"), a member in the litigation practice group; and (f) Nathaniel Saxe ("Saxe"), a then-associate in the litigation practice group.

24. On information and belief, Murchison was retained by INR from approximately May 2022 to May 2023. During Murchison's representation of INR, Flanagan, despite being an associate, handled the substantial majority of the attorney work for INR. Manuel Gurule ("Gurule"), who, at that time, was an associate at Murchison, also performed some work for INR, at Flanagan's direction or under his supervision. No other Murchison attorney, including any partner, ever billed any time on the INR matter. However, on information and belief, (a) R. Scott



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

Rasmussen ("Rasmussen"), who, at that time, was a partner at Murchison in its Las Vegas office, and (b) Michael Nunez ("Nunez"), who, at that time, was a senior (i.e., equity) partner at Murchison and the partner in charge of the firm's Las Vegas office, were at least aware of the firm's representation of INR and may have indirectly provided legal advice to INR, as a result of communicating with Flanagan after he reached out to discuss the INR matter, whether he did so for the purpose of seeking advice or providing an update as to matters on which he was working.

**D. Murchison's Opening of the INR Matter.**

25. Less than a month after he began working at Murchison, Flanagan sought to have the firm open up a new matter or file for the firm's proposed representation of INR.

26. On information and belief, on or about May 27, 2022, Murchison ran a conflicts check on the proposed matter, which involved cross-referencing against Murchison's client and matter database the names of 173 persons or entities, including "Integrated Natural [sic] Resources" (which was the name that Flanagan incorrectly provided), "WeedGenics.com" (identified by Flanagan as INR's DBA), "West Coast Development," "Michael D Garcia," and 169 of INR's investors. Murchison ultimately determined that there were no conflicts of interest.

27. On information and belief, on or about May 31, 2022, Flanagan, on behalf of Murchison, signed and Garcia, on behalf of INR, purportedly signed the retainer agreement between Murchison, as attorney, and INR, as client (the "Retainer Agreement"). On information and belief, Flanagan had obtained one of Murchison's form retainer agreements and then filled it out accordingly. On information and belief, Flanagan had asked Rasmussen who should sign the Retainer Agreement, and Rasmussen informed Flanagan that Flanagan could and should sign the Retainer Agreement on behalf of Murchison, which Flanagan did, in fact, do following Rasmussen's recommendation. On information and belief, in



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

reality, however, Flanagan was not authorized to sign the Retainer Agreement on behalf of Murchison.

28. The Retainer Agreement provided, among other things, "John Ryan Flanagan will be the firm's primary contact for Client and the work will be performed primarily by John Ryan Flanagan to counsel client in business related matters and any other legal counsel requested by client," and "The legal services to be provided by Attorney to Client [sic] in connection with the renegotiation of financing agreements and preparing and/or reviewing any requested transactional documents." The Retainer Agreement specified that Rasmussen's hourly rate was $450 and Flanagan's hourly rate was $375, while generally stating that other partners' hourly rate was $450, other associates' hourly rate was $325, and paralegals' hourly rate was $150.

29. On information and belief, Flanagan directed INR to wire $10,000 to Murchison for the firm's retainer, and INR then wired $10,000 to Murchison's bank account on or about May 31, 2022.

30. That same day, after the Retainer Agreement had been fully executed and the wire transfer had been completed, Flanagan requested his legal assistant to have Murchison open a new file for the firm's representation of INR. Later that day, another legal assistant sent an email to Flanagan, Rasmussen, Elizabeth Pando (Murchison's human resources director), and other Murchison personnel, informing them that the firm had now opened a file for the INR matter, designated as file no. 48619. The legal assistant's email attached (a) a "matter information sheet" regarding the new file, which listed Flanagan and Rasmussen as the "1st attorney[s]" and categorized the kind of matter as "Corporation Transactions," (b) another document that was required to open the new file, which identified the "handling attorney/backup attorney" as "JRF/RSR" (i.e., Flanagan and Rasmussen), and (c) the executed Retainer Agreement. On information and belief, Rasmussen

had seen this email and, as a result, had been aware of Murchison's representation of INR since at least late May 2022.

31. In connection with opening new matters, Murchison maintains a policy that awards a Murchison attorney "referral fees" for bringing in new clients or matters to the firm, which must be requested by the attorney and then approved by the firm. Once the INR matter was opened, Flanagan sought referral fees for the matter, which were later approved and paid by Murchison.

32. On or about June 7, 2022, Flanagan sent an email to Nunez requesting that Nunez review Flanagan's referral fee approval form prepared in connection with Murchison's representation of INR (the "Referral Fee Form"). On information and belief, Flanagan sent the Referral Fee Form to Nunez because Nunez was, at that time, a senior partner and the partner in charge of the Las Vegas office (i.e., the highest ranking partner in that office). In the Referral Fee Form, (a) the name of the client was identified as "Integrated National Resources, Inc.," (b) the client was identified as a new client, (c) the source of the referral was stated as "Ryan Flanagan brought in the client through a prior relationship," (d) Flanagan was identified as the "referring attorney" and "handling attorney," (e) the hourly rates of the "working attorneys" were provided for Flanagan (at $375) and Rasmussen (at $450), and (f) the work type was described as "corporate transactional."

33. On information and belief, Nunez reviewed the Referral Fee Form, and approximately three minutes after receiving Flanagan's June 7, 2022, email, Nunez sent an email to Flanagan, indicating that the Referral Fee Form "look[ed] fine" and that he "will sign" it. On information and belief, Nunez subsequently signed the Referral Fee Form on the signature line designated for the "signature of approving partner," and after Nunez did so, Flanagan's legal assistant emailed the signed Referral Fee Form to Flanagan, Nunez, and Dave Cunningham (Murchison's chief financial officer). On information and belief, as he had signed the Referral Fee

Form for the INR matter, Nunez had been aware of Murchison's representation of INR since at least early June 2022.

34. On information and belief, Murchison's representation of INR was a highly unique matter for the firm for many reasons, including in terms of the substantive work the firm was performing and the manner in which the matter came in and was then administratively handled within the firm. Notwithstanding how out of the ordinary the INR matter was for the firm, Murchison deviated from its usual practices and policies and permitted Flanagan to perform legal work for INR for a roughly one-year period, with the firm ultimately receiving hundreds of thousands of dollars in fees from INR and awarding Flanagan with tens of thousands of dollars in referral fees (discussed below).

35. Murchison is a litigation-centric law firm, primarily handling insurance defense matters, but, as characterized by Dan Longo ("Longo"), the firm's managing partner, it does a "very, very small amount of transactional work" as well. On information and belief, during Murchison's representation of INR, the firm had only one purely transactional attorney (while other attorneys in the firm may handle ancillary transactional matters from time to time), and the kinds of transactional matters that the firm would typically handle (i.e., by that one transactional attorney) were lease negotiations and contract negotiations. While the INR matter was mostly transactional in nature, Murchison's work for INR implicated securities law, an area of law that, without question (and by Longo's admission), was outside of the firm's expertise.

36. Not only was the INR matter a new matter brought to Murchison that was outside of the firm's expertise, but the INR matter had been brought in by an associate. According to Longo, excluding the INR matter brought in by Flanagan, no Murchison associate had brought in a new client or matter to the firm in at least the past five years. On top of that, the INR matter was even more unusual for the

firm given that it had been brought in by a newly hired associate who, at that time, had only been employed by Murchison for less than a month.

37. The INR matter was also out of the ordinary for Murchison in terms of how the matter was staffed. On information and belief, when a particular matter is staffed with an associate, Murchison's practice is to have that associate always working in conjunction with the partner staffed on the matter, where the partner is expected to regularly communicate with the associate, review the associate's work product, and review the associate's billing. In contrast, on information and belief, despite (a) multiple Murchison partners (i.e., Rasmussen and Nunez) being aware of the INR matter from at least late May or early June 2022 and (b) Rasmussen being identified as one of the attorneys handling the matter (along with Flanagan), Murchison allowed Flanagan to run the INR matter completely on his own, without any partner supervision or involvement. In fact, there were no billing entries by a Murchison partner in any of the firm's invoices to INR (i.e., the only attorney billing entries were from associates), which Longo described as "extremely unusual" for the firm.

38. On information and belief, Rasmussen and Nunez, despite their awareness of the INR matter as a result of receiving the Retainer Agreement and Referral Fee Form, also failed to follow Murchison's established practices and policies regarding such documents. More specifically, on information and belief, those practices and policies provide that, for any new matter originating out of the firm's Las Vegas office, Longo, as the firm's managing partner, was the only person within the firm authorized to (a) prepare and execute a retainer agreement on behalf of Murchison and (b) sign off on an attorney's referral fee approval form. With respect to the INR matter, Longo, however, was not involved in the preparation or signing of either document. On information and belief, instead of alerting Longo about the INR matter at the outset, Rasmussen told Flanagan that he



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

could sign the Retainer Agreement on behalf of Murchison, and Nunez approved the Referral Fee Form himself.

39. On information and belief, Murchison also failed to follow its own policies regarding the invoicing process when it came to the INR matter. On information and belief, under those policies, before a monthly invoice for a matter is sent out by the firm to the client, the partner in charge of the office from which the matter originated is supposed to review the pre-bill for the matter (in addition to the relationship attorney and handling attorney reviewing the pre-bill). On information and belief, neither Nunez nor any other Murchison partner received or reviewed any of the pre-bills for the INR matter, and instead, the only attorney to receive those pre-bills from the firm's accounting department and then review them was Flanagan, a newly-hired junior associate.

40. In the end, on information and belief, Murchison failed to oversee or supervise Flanagan's handling of the INR matter, despite the firm's knowledge of how extraordinary the matter was for the firm, including that (a) Flanagan, who was running the INR matter on his own, was only a newly-hired junior associate, had no expertise in transactional matters and no experience in securities law, and had only been with the firm for less than a month when the matter came in, (b) the Retainer Agreement and Referral Fee Form had not gone through the usual channels within the firm, and (c) the INR matter represented one of the very few transactional matters that the firm handled.

**E. Dickinson Wright's Initial Preparation of the Offering Documents.**

**1. <u>The Initial Meeting and Strategy.</u>**

41. On information and belief, in or about early 2022, an initial meeting took place at Dickinson Wright's Las Vegas office, which Garcia, Flanagan, and Everage attended in person and Crow attended by phone. On information and belief, at this meeting, Garcia described to the attorneys the purported circumstances that compelled INR to seek out legal counsel, including that INR had



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP ATTORNEYS AT LAW

entered into the Original Investor Agreements with hundreds of investors, could no longer make the monthly payments to the investors pursuant to those agreements, and that INR wanted to also pursue an equity offering to raise additional capital. According to Flanagan, at this meeting, the existence of "handshake deals" relating to INR's cannabis facilities was disclosed to the Dickinson Wright attorneys, which led to Crow recommending to Garcia that INR enter into written agreements with the applicable counterparties on all of these handshake deals, which Garcia vehemently rejected.

42. On information and belief, at or shortly following the meeting, Dickinson Wright developed a legal strategy for INR, in which INR would present those investors who were a party to an Original Investor Agreement with the option to restructure or convert the debt owed by INR to them into equity in INR, in the form of shares of "Series A" preferred stock issued as part of INR's equity offering. On information and belief, as part of this strategy, such investors would also be given the option of later converting their shares of Series A preferred stock into shares of common stock (which provided holders with voting rights, in contrast to holders of preferred stock who did not have any voting rights). On information and belief, INR's equity offering would also involve offering shares of "Series B" preferred stock (which had less favorable terms compared to Series A preferred stock).

**2. The Set of Offering Documents.**

43. To implement this strategy, numerous documents or forms were created in connection with INR's purported equity offering (collectively, the "Offering Documents"), including, without limitation, (a) a document titled *Amended and Restated Certificate of Incorporation of Integrated National Resources, Inc.* (the "Certificate of Incorporation"), (b) a document titled *Confidential Private Placement Memorandum* (the "PPM"), (c) a document titled *Subscription Agreement* (the "Subscription Agreement"), (d) a document titled

*Stockholders Agreement* (the "Stockholders Agreement"), and (e) a document titled *Investors' Rights Agreement* (the "Investors' Rights Agreement").

44. On information and belief, (a) the Certificate of Incorporation was intended to address INR's corporate governance matters and establish the classes and number of shares of common stock and preferred stock that INR could issue, along with the rights and limitations associated with such shares; (b) the PPM was intended to be given to potential investors interested in participating in INR's equity offering, which purportedly disclosed background information regarding INR and its offering; (c) the Subscription Agreement was a purported agreement between INR and an investor intended to provide for the investor's purchase of shares of preferred stock in INR; (d) the Stockholders Agreement was a purported agreement between INR, its purported initial shareholders (Garcia, Williams, Nash, Benton, and Lavego), and a new shareholder (i.e., an investor) intended to address the management of INR and the shareholders' rights on issues such as transferring shares in and obtaining information from INR; and (e) the Investors' Rights Agreement was a purported agreement between INR and an investor who was a party to an Original Investor Agreement, which was intended to address the investor's rights after agreeing to restructure or convert their debt into equity.

45. On information and belief, despite Dickinson Wright taking the lead in developing the strategy for INR's debt restructuring and equity offering, Murchison, through Flanagan, nevertheless took on an active role in preparing the Offering Documents alongside Dickinson Wright. On information and belief, Dickinson Wright and Murchison mutually understood that Dickinson Wright would take the laboring oar in preparing the initial drafts of the Offering Documents, which were drafted by July and Gilligan. Nevertheless, on information and belief, after those initial drafts were prepared, Flanagan became significantly involved in filling in certain content within the Offering Documents that had been missing and also reviewing, revising, and finalizing the entirety of the Offering

Documents. On information and belief, in particular, Dickinson Wright was primarily relying on Flanagan to provide the relevant factual information or background relating to INR that would be inserted into the Offering Documents.

46. On information and belief, Dickinson Wright had been preparing the initial drafts of the Offering Documents from approximately May through early July 2022, and Dickinson Wright began circulating drafts to Murchison in or about late June 2022.

**3. <u>June 23, 2022: July Sends Drafts of Certificate of Incorporation and PPM to Flanagan.</u>**

47. On or about June 23, 2022, Flanagan and Everage had the following text-message exchange:




On information and belief, Dickinson Wright and Murchison mutually understood that, notwithstanding Dickinson Wright's role in preparing the initial drafts of the Offering Documents, the Dickinson Wright attorneys were depending on Flanagan's active and continued involvement in the drafting process and that Dickinson Wright would not send any drafts of the Offering Documents directly to INR for its review or approval but would send all drafts to Flanagan instead.

Indeed, according to Everage, Dickinson Wright viewed Flanagan as INR's general counsel and effectively treated him as the client contact who was required to provide direct input on the Offering Documents.

48. Later that day, July sent an email to Flanagan, attaching drafts of the (a) Certificate of Incorporation and (b) PPM, and stating the following:

> Ryan, in connection with the proposed restructuring of Integrated National Resource's indebtedness, and potential equity offering, please find attached draft Amended & Restated Articles of Incorporation and PPM. After reviewing, please let us know any thoughts you may have and when you may be available to discuss.

On information and belief, these drafts represented the first drafts of the Certificate of Incorporation and PPM circulated between Dickinson Wright and Murchison and had been prepared by Dickinson Wright.

49. The draft of the Certificate of Incorporation sent by July included the following disclaimer (the "Disclaimer") at the top of the first page of the document:

> This sample document is the work product of a national coalition of attorneys who specialize in venture capital financings, working under the auspices of the NVCA [the National Venture Capital Association]. This document is intended to serve as a starting point only, and should be tailored to meet your specific requirements. This document should not be construed as legal advice for any particular facts or circumstances. Note that this sample document presents an array of (often mutually exclusive) options with respect to particular deal provisions.

This draft of the Certificate of Incorporation had various sections where information needed to be added or confirmed, such as the number of shares of common stock and preferred stock that INR was authorized to issue and the par value of those shares.

50. The draft of the PPM sent by July similarly had numerous sections where information was entirely missing and needed to be added, including sections describing INR's company structure and management, its business objectives and strategy, the terms of its proposed equity offering, and its intended use of the proceeds from the offering. This draft of the PPM did, however, include more generic sections, such as discussions of the regulatory environment for the cannabis

industry, the risk factors for a cannabis company or a company pursuing an equity offering, and who is eligible to participate in the offering, and this draft of the PPM also included more INR-specific sections, such as a description of its purported business.

51. In response to July's June 23, 2022, the following day, Flanagan sent an email to July, stating the following (bracketed text found in the original):

> Thank you for the documents. I will start a complete review this weekend. I would like to schedule a meeting on Monday to go over the documents with you and/or your team.
>
> That being said, I did quickly run through them and wanted to point out issues I've already found.
>
> PPM
>
> VI. DESCRIPTION OF BUSINESS
>
> Page 30: Details – Ownership [in the event of facility sale award … award of closing settlement payment]
>
> Page 31: Equity Share/Ownership
>
> These sections will need to be restated. This was one [of many] issues with the original contracts the ambiguity of which was caused by a non-lawyers drafting. To clarify, INR does own the tenant improvements and the product inside the facility, but only leases the facility there product is in. Additionally, these are only handshake deals with no paperwork to back them up. I believe the idea with the PPM was that this Equity/ownership was to be preferred stock as stated in the beginning of the memo.

On information and belief, Flanagan had reviewed the drafts of the Certificate of Incorporation and PPM sent by July and, based on his review, was providing comments to July regarding substantive portions to be revised in the PPM based primarily on information that Flanagan had received from Garcia (the accuracy of which Flanagan did not verify). On information and belief, Dickinson Wright relied on Flanagan to provide the relevant facts concerning INR, including, in particular, about its cannabis facilities. Indeed, according to Everage, Flanagan had told Everage and other Dickinson Wright attorneys that Flanagan had personally visited and toured one of INR's cannabis facilities.

52. Shortly after sending his email to July, Flanagan forwarded July's June 23, 2022, email (along with the drafts of the Certificate of Incorporation and PPM) to Garcia, in which Flanagan stated the following (bracketed text found in the original):

> Please see the attached documents.
>
> I've already pointed out some issues to DW [like still mentioning the CA facility], and requested a meeting on Monday. As discussed I will create a list of questions for you so that we can get these documents finalized.

On information and belief, Flanagan knew that he was expected to review and be familiar with the Offering Documents to such an extent that he could identify for INR the subject matters therein where information was still needed from the client.

53. On information and belief, throughout the preparation of the Offering Documents, Flanagan was aware that the PPM and the other Offering Documents would not only be circulated to existing investors, who INR hoped would agree to convert their debt into equity, but also to new potential investors, who would be contributing new funds into INR in exchange for equity.

**4. June 28, 2022: Flanagan Meets with the Dickinson Wright Attorneys.**

54. On information and belief, on or about June 28, 2022, beginning at approximately 9:45 a.m., Flanagan, July, Gilligan, and Everage participated in a Zoom meeting in which they discussed the ongoing preparation of the Offering Documents.

55. On information and belief, shortly following the meeting that same day, Flanagan sent an email to the Dickinson Wright attorneys, which stated, "The funds will be used for real estate, buildout, and equipment," and then listed biographical information about INR's "core principals" that Flanagan had received from Garcia. On information and belief, Flanagan was providing this information

to the Dickinson Wright attorneys so that they could update the draft of the PPM accordingly.

### 5. July 6, 2022: Gilligan Sends Drafts of PPM, Subscription Agreement, and Stockholders Agreement to Flanagan.

56. On or about July 6, 2022, Gilligan sent multiple emails to Flanagan, in which he attached drafts of the (a) PPM, (b) Subscription Agreement, and (c) Stockholders Agreement. In one email, Gilligan stated, "The updated PPM is attached for your review. There are still a couple of items where we will need client input, but it is ready to circulate for their feedback." On information and belief, these drafts of the Subscription Agreement and Stockholders Agreement represented the first drafts of the Subscription Agreement and Stockholders Agreement circulated between Dickinson Wright and Murchison and had been prepared by Dickinson Wright.

57. The draft of the PPM sent by Gilligan to Flanagan on or about July 6, 2022, differed from the draft of the PPM previously sent by July to Flanagan on or about June 23, 2022, and had a number of revisions, including the following (which had been suggested by Flanagan): (a) the biographical information about INR's core principals was added, (b) a statement was added that the proceeds from the offering would be "used by the Company for purposes of purchasing real estate, buildout of Company facilities, and equipment," and (c) the mentions of the sale of the Adelanto facility were removed. On information and belief, Gilligan was the person who made these revisions before sending this revised draft of the PPM to Flanagan. This draft of the PPM sent by Gilligan to Flanagan nevertheless still had numerous sections where information was entirely missing, including sections describing INR's business objectives and strategy and the terms of its proposed equity offering.

58. The draft of the Subscription Agreement sent by Gilligan was similarly missing certain information, such as the per share price of the shares of Series A

preferred stock to be purchased by an investor. And the draft of the Stockholders Agreement sent by Gilligan was also missing certain information, such as the total number of shares of common stock and Series A preferred stock that INR has issued and the par values thereof.

**6. July 13, 2022: July Sends Drafts of Certificate of Incorporation and Investors' Rights Agreement to Flanagan.**

59. On or about July 13, 2022, July sent an email to Flanagan, which attached drafts of the (a) Certificate of Incorporation and (b) Investors' Rights Agreement. On information and belief, this draft of the Investors' Rights Agreement represented the first draft of the Investors' Rights Agreement circulated between Dickinson Wright and Murchison and had been prepared by Dickinson Wright.

60. The draft of the Certificate of Incorporation sent by July to Flanagan on or about July 13, 2022, differed from the draft of the Certificate of Incorporation previously sent by July to Flanagan on or about June 23, 2022, and had a number of revisions, including the following: (a) $0.0001 and $0.00001 were added as the par values for a share of common stock and a share of Series A preferred stock, respectively, (b) 8% was added as the annual rate of the "Original Issue Price" of a share of Series A preferred stock used in calculating the dividend thereof, (c) $1,000 was added as the "Original Issue Price" per share of Series A preferred stock, and (d) $1,000 was added as the "Conversion Price" per share of Series A preferred stock in connection with any conversion of such shares to shares of common stock. On information and belief, July was the person who made these revisions before sending this revised draft of the Certificate of Incorporation to Flanagan.

61. The draft of the Investors' Rights Agreement sent by July included the same Disclaimer as in the draft of the Certificate of Incorporation and was, like

other drafts of other Offering Documents, missing various information, including the par values for a share of common stock and a share of Series A preferred stock and the number of shares needed to be held by an investor in order to constitute a "Major Investor."

### 7. **August 2 and 3, 2022: Flanagan Sends Drafts of Offering Documents to INR.**

62. On or about August 2, 2022, Flanagan sent an email to Garcia, in which he attached drafts of the (a) Certificate of Incorporation, (b) PPM, (c) Subscription Agreement, (d) Stockholders Agreement, and (e) Investors' Rights Agreement. In the email, Flanagan also stated, "Please see attached documents and let me know any issues you might see. There are some blanks to fill in that we should discuss. Once reviewed and approved. I'll start the process to get INR transferred to Delaware. That will need to be done before finalizing any investors."

63. The draft of the Certificate of Incorporation sent by Flanagan to Garcia on or about August 2, 2022, slightly differed from the draft of the Certificate of Incorporation previously sent by July to Flanagan on or about July 13, 2022, in that various sections where information needed to be added or confirmed had been highlighted. On information and belief, Flanagan was the person who had made those highlights before sending this revised draft of the Certificate of Incorporation to Garcia.

64. The draft of the PPM sent by Flanagan to Garcia on or about August 2, 2022, differed from the draft of the PPM previously sent by Gilligan to Flanagan on or about July 6, 2022, and had a number of revisions, including the following: (a) 1,000 and 30,000 were added as the minimum and maximum number of shares of Series A preferred stock available to purchase in INR's offering, respectively, (b) the par value of a share of Series A preferred stock was changed from $0.0001 to $0.00001 per share, (c) $1,000 was added as the purchase price per share of Series A preferred stock, and (d) $1 million and $30 million were added as the



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

minimum and maximum aggregate purchase price for shares of Series A preferred stock, respectively. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the PPM to Garcia.

65. The draft of the Subscription Agreement sent by Flanagan to Garcia on or about August 2, 2022, was similar to the draft of the Subscription Agreement previously sent by Gilligan to Flanagan on or about July 6, 2022, with no substantive revisions made in the later draft.

66. The draft of the Stockholders Agreement sent by Flanagan to Garcia on or about August 2, 2022, differed from the draft of the Stockholders Agreement previously sent by Gilligan to Flanagan on or about July 6, 2022, and had a number of revisions, including the following: (a) $0.0001 was added as the par value of a share of common stock, (b) $0.00001 was added as the par value of a share of Series A preferred stock, and (c) the number of directors of INR's board was changed from "three (3)" to "three (5) [sic]" directors. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Stockholders Agreement to Garcia.

67. The draft of the Investors' Rights Agreement sent by Flanagan to Garcia on or about August 2, 2022, differed from the draft of the Investors' Rights Agreement previously sent by July to Flanagan on or about July 13, 2022, and had a number of revisions, including the following: (a) 3,000,000 was added as the number of shares needed to be held in order to constitute a "Major Investor," and (b) $0.00001 was added as the par value of a share of Series A preferred stock. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Investors' Rights Agreement to Garcia.

68. The following day, on or about August 3, 2022, Flanagan, by email, also forwarded drafts of the (a) Certificate of Incorporation, (b) PPM, and (c) Subscription Agreement, as well as samples of the Original Investor Agreements, to Bovee. Flanagan's email was sent to Bovee's personal email

address (alexandriabovee1@gmail.com) but had the subject line "Confidential Attorney Client Privilege." The drafts of the Certificate of Incorporation, PPM, and Subscription Agreement sent by Flanagan to Bovee on or about August 3, 2022, were the same drafts of the Certificate of Incorporation, PPM, and Subscription Agreement previously sent by Flanagan to Garcia on or about the prior day.

**8. <u>August 12, 2022: Gilligan Asks Flanagan for an Update.</u>**

69. On or about August 12, 2022, Gilligan sent an email to Flanagan (also copying July and Crow), in which he stated the following: "Hope all is well. Just wanted to check in to see where things stand with the PPM, and operating documents. Let us know if there is anything you need at the moment, or if you want to touch base on a call early next week." On information and belief, at that time, neither Gilligan, nor July, nor Crow was aware of what INR or Murchison was doing with the drafts of the Offering Documents (e.g., whether Flanagan was working with the client to revise them). On information and belief, Flanagan did not respond to Gilligan's email or otherwise provide Gilligan with an update on the status of the Offering Documents until more than five weeks later (as discussed below).

70. On information and belief, (a) after Gilligan sent drafts of the PPM, Subscription Agreement, and Stockholders Agreement to Flanagan on or about July 6, 2022, Gilligan did not circulate any other draft of any Offering Document to Flanagan again, (b) after July sent drafts of the Certificate of Incorporation and Investors' Rights Agreement to Flanagan on or about July 13, 2022, July did not circulate any other draft of any Offering Document to Flanagan again, and (c) Crow had never circulated any draft of any Offering Document to Flanagan.

**F. Murchison's Preparation of the Offering Documents.**

71. On information and belief, in or about mid-August 2022, Garcia informed Flanagan that the Offering Documents needed to be completed as soon as possible so that they could be immediately sent out to INR's investors in

connection with INR's campaign to pressure investors to restructure their Original Investor Agreements. On information and belief, in response, Flanagan then took the lead in revising and finalizing the Offering Documents. On information and belief, after receiving Garcia's instructions, Flanagan did not communicate with any attorney at Dickinson Wright, other than Everage, about revising and finalizing the Offering Documents.

72. On information and belief, with the drafts of the Offering Documents prepared by Gilligan and July in hand, Flanagan first collaborated with Bovee on updating and revising those drafts, which still needed various information to be added or confirmed. On information and belief, once he was done working with Bovee, Flanagan then worked only with Everage and no other Dickinson Wright attorney in making the final revisions to the drafts of the Offering Documents. On information and belief, Flanagan proceeded in this manner, despite knowing that Everage was, like Flanagan himself, (a) not a securities attorney, (b) only a junior-level associate attorney at that time, and (c) not involved in the initial principal drafting of the Offering Documents.

73. On information and belief, the last time that a Dickinson Wright partner or of counsel or a Dickinson Wright securities attorney was involved in the preparation of the Offering Documents before they were sent out to investors was on or about July 6 and 13, 2022, when Gilligan and July emailed drafts of the Offering Documents to Flanagan, respectively. On information and belief, Flanagan only worked with Everage in and excluded Gilligan, July, Crow, and other Dickinson Wright attorneys from the last steps of the drafting process because Flanagan anticipated that the involvement of any other Dickinson Wright attorney would likely lead to questions and concerns being raised by such attorney that could hinder or prevent the Offering Documents from being sent to investors.

**1. <u>August 14, 2022: Flanagan Sends Drafts of Offering Documents to Bovee.</u>**

74. On or about August 14, 2022, Flanagan sent an email to Bovee (again, at her personal email address), which attached drafts of the (a) Certificate of Incorporation, (b) PPM, (c) Subscription Agreement, (d) Stockholders Agreement, and (e) Investors' Rights Agreement.

75. The draft of the Certificate of Incorporation sent by Flanagan to Bovee on or about August 14, 2022, differed from the draft of the Certificate of Incorporation previously sent by Flanagan to Garcia on or about August 2, 2022 (and also forwarded by Flanagan to Bovee on or about August 3, 2022), and had a number of revisions, including the following: (a) the number of shares of common stock that INR could issue was changed from 10 million to 1 billion, (b) the number of shares of Series A preferred stock that INR could issue was changed from 30 million to 100 million, and the par value of such share was changed from $0.00001 to $0.0001, (c) the "Original Issue Price" per share of preferred stock was changed from $1,000 to $10, (d) the provision giving holders of preferred stock the right to vote was deleted, while a provision was added stating, "Preferred Stock shall not be entitled to vote on any matter presented to the stockholders of the Corporation," (e) three was added as the number of directors that holders of common stock were entitled to elect to INR's board of directors, while a provision was added stating, "Preferred Stock shall not be entitled to elect or vote to elect directors of the Corporation," and (f) $5 was added as the minimum price per share of common stock in a public sale of common stock that would trigger a mandatory automatic conversion of all outstanding shares of preferred stock to shares of common stock. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Certificate of Incorporation to Bovee.

76. The drafts of the PPM and Subscription Agreement sent by Flanagan to Bovee on or about August 14, 2022, were the same drafts of the PPM and Subscription Agreements previously sent by Flanagan to Garcia on or about August 2, 2022 (and also forwarded by Flanagan to Bovee on or about August 3, 2022).

77. The drafts of the Stockholders Agreement and Investors' Rights Agreement sent by Flanagan to Bovee on or about August 14, 2022, were the same drafts of the Stockholders Agreement and Investors' Rights Agreement previously sent by Flanagan to Garcia on or about August 2, 2022.

**2. <u>August 22, 2022: Flanagan Sends Final Draft of Certificate of Incorporation to Garcia.</u>**

78. On or about August 22, 2022, Flanagan sent an email to Garcia, in which he attached a draft of the Certificate of Incorporation for Garcia's review, approval, and signature.

79. The draft of the Certificate of Incorporation sent by Flanagan to Garcia on or about August 22, 2022, differed from the draft of the Certificate of Incorporation previously sent by Flanagan to Bovee on or about August 14, 2022, and had a number of revisions, including the following: (a) the Disclaimer was deleted, (b) the number of shares of common stock was changed from 1 billion to 10 billion, (c) the number of shares of Series A preferred stock was changed from 100 million to 5 million, (d) a class of shares of Series B preferred stock was created, which involved the addition of several new provisions relating to such class, (e) the "Original Issue Price" for Series A preferred stock was changed from $10 to $1,000, (f) the number of directors that holders of common stock (or Series B preferred stock) could elect was changed from three to five, (g) the "Conversion Price" for Series A (and Series B) preferred stock was changed from $1,000 to $333.33, and (h) the minimum price per share of common stock in a public sale of common stock that would trigger a mandatory automatic conversion



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

of all outstanding shares of preferred stock to shares of common stock was changed from $5 to $1 (provided that INR receives $1 million in gross proceeds from such sale). The revisions relating to Series B preferred stock included the addition of provisions providing (w) that INR could issue 5 million shares of Series B preferred stock, with a par value of $0.0001 per share, (x) for dividends to holders of shares of Series B preferred stock, which would be at an annual rate of 2% of the "Original Issue Price" of such shares (as opposed to 8% for holders of shares of Series A preferred stock), (y) for preferential payments to holders of shares of Series B preferred stock in the event of INR's dissolution, and (z) that, unlike holders of shares of Series A preferred stock, holders of shares of Series B preferred stock would have voting rights. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Certificate of Incorporation to Garcia.

### 3. **<u>August 27, 2022: Flanagan Sends Drafts of Four Offering Documents to Bovee.</u>**

80. On or about August 27, 2022, Flanagan sent an email to Bovee, in which he attached drafts of the (a) PPM, (b) Subscription Agreement, (c) Stockholders Agreement, and (d) Investors' Rights Agreement.

81. The draft of the PPM sent by Flanagan to Bovee on or about August 27, 2022, differed from the draft of the PPM previously sent by Flanagan to Bovee on or about August 14, 2022, and had a number of revisions, including the following: (a) the maximum number of shares of Series A preferred stock available to purchase in INR's offering was changed from 30,000 to 60,000, and (b) the maximum aggregate purchase price for shares of Series A preferred stock was changed from $30 million to $60 million. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the PPM to Bovee.

82. The draft of the Subscription Agreement sent by Flanagan to Bovee on or about August 27, 2022, differed from the draft of the Subscription Agreement previously sent by Flanagan to Bovee on or about August 14, 2022, and had a number of revisions, including the following: (a) $1,000 was added as the price per share in connection with the purchase of any shares of Series A Preferred Stock in INR's offering, and (b) the governing law for construing the Subscription Agreement was changed from Delaware law to Nevada law. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Subscription Agreement to Bovee.

83. The draft of the Stockholders Agreement sent by Flanagan to Bovee on or about August 27, 2022, differed from the draft of the Stockholders Agreement previously sent by Flanagan to Bovee on or about August 14, 2022, and had a number of revisions, including the following: (a) the number of shares of common stock that INR has issued was changed from 10 million to 2 billion, (b) the number of shares of Series A preferred stock that INR has issued was changed from 30 million to 5 million, and the par value of such share was changed from $0.00001 to $0.0001, (c) a provision was added indicating that INR has also issued 5 million shares of Series B preferred stock, with a par value of $0.000.1 per share, (d) the number of directors of INR's board was changed from "three (5)" to "three (3)" directors, (e) the maximum amount for a debt transaction that INR could enter into without needing to obtain supermajority approval of its stockholders was changed from $100,000 to $500,000, (f) the maximum aggregate amount for a series of debt transactions that INR could enter into without needing to obtain supermajority approval of its stockholders was changed from $250,000 to $2.5 million, (g) the maximum value of an asset for which INR could sell or lease in a transaction without needing to obtain supermajority approval of its stockholders was changed from $100,000 to $10 million, and (h) the information in Schedule A regarding the initial stockholders of INR was partially added, listing out the following individuals

as having the following percentage ownership stakes: (1) Garcia, with 25%, (2) William, with 51%, (3) Nash, with 8%, (4) Benton, with 8%, and (5) Lavego, with 8%. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Stockholders Agreement to Bovee.

84. The draft of the Investors' Rights Agreement sent by Flanagan to Bovee on or about August 27, 2022, differed from the draft of the Investors' Rights Agreement previously sent by Flanagan to Bovee on or about August 14, 2022, and had a number of revisions, including the following: (a) $0.0001 was added as the par value of a share of common stock, (b) the number of shares needed to be held in order to constitute a "Major Investor" was changed from 3 million to 10 million shares, (c) the par value of a share of Series A preferred stock was changed from $0.00001 to $0.0001, (d) the capitalized term "Series B Preferred Stock" and its definition were added, (e) INR's notice address was changed from the address of Dickinson Wright's Columbus office (to the attention of Crow) to the address of INR's virtual office located at 3960 Howard Hughes Parkway, Suite 500, Las Vegas, NV 89169, and (f) the location of any arbitration (in the event of any dispute) was changed from Washington, DC to, Las Vegas. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Investors' Rights Agreement to Bovee.

**4. <u>August 29, 2022, at 8:39 a.m.: Flanagan Sends Draft of Stockholders Agreement to Bovee.</u>**

85. On or about August 29, 2022, at approximately 8:39 a.m., Flanagan sent an email to Bovee, attaching a draft of the Stockholders Agreement and stating, "I corrected the error message to the correct section of the document. Did you make any changes to the PPM? If not I can correct the typo and send you a new version." The draft of the Stockholders Agreement sent by Flanagan to Bovee at this time was similar to the draft of the Stockholders Agreement previously sent by Flanagan to Bovee on or about August 27, 2022, with no substantive revisions

made in the later draft. Instead, on information and belief, Flanagan had fixed some of the error codes in the document before sending this revised draft of the Stockholders Agreement to Bovee.

**5. <u>August 29, 2022, at 4:37 p.m.: Bovee Sends Draft of Stockholders Agreement to Flanagan.</u>**

86. On or about August 29, 2022, at approximately 4:37 p.m., Bovee sent an email to Flanagan, which attached a draft of the Stockholders Agreement. The draft of the Stockholders Agreement sent by Bovee to Flanagan at this time differed from the draft of the Stockholders Agreement sent by Flanagan to Bovee earlier that day, at approximately 8:39 a.m., and had a number of revisions, including the following: (a) the provision providing for a stockholder's right to receive INR's annual financial statements was significantly changed, in that the financial statements that INR would make available a stockholder were no longer "audited" financial statements (i.e., any mention of "audited" was deleted) and such financial statements were represented as having been prepared in accordance with "standard practices" (changed from having been prepared in accordance with "GAAP"), (b) the provision providing for a stockholder's right to receive INR's quarterly financial statements was entirely deleted, (c) the provision providing for a stockholder's right to have reasonable access to INR's facilities and its books and records was entirely deleted, and (d) the information in Schedule B regarding the initial directors of INR was added, listing out the following individuals: Garcia (also identified as the CEO), Williams (vice president), Nash (general manager), Benton (grow facility manager), and Lavego (key coordinator). On information and belief, Bovee was the person who had made these revisions before sending this revised draft of the Stockholders Agreement to Flanagan.

**6. August 29, 2022, at 4:58 p.m.: Bovee Sends Draft of PPM to Flanagan.**

87. On or about August 29, 2022, at approximately 4:58 p.m., Bovee sent an email to Flanagan, which attached a draft of the PPM. The draft of the PPM sent by Bovee to Flanagan at this time differed from the draft of the PPM sent by Flanagan to Bovee on or about August 27, 2022, and had a number of revisions, including the following: (a) in the introduction section, information regarding the purpose for INR's formation, its company objectives, business strategy, and board of directors was added, (b) the number of shares of Series A preferred stock that INR was offering as part of its offering was changed from 30 million to 60 million, (c) $649,828 was added as the amount of INR's consolidated debt as of December 31, 2021, and (d) "Aia Montgomery" was identified as the contact person for any questions regarding the offering. On information and belief, Bovee was the person who had made these revisions before sending this revised draft of the PPM to Flanagan.

**7. August 29, 2022, at 8:25 p.m.: Flanagan Sends Drafts of Four Offering Documents (Relating to Series A Offering) to Bovee.**

88. On information and belief, on or about August 29, 2022, at approximately 8:25 p.m., Flanagan, using his personal email address (jrflan@gmail.com), sent an email to Bovee, in which he attached drafts of the (a) PPM, (b) Subscription Agreement, (c) Stockholders Agreement, and (d) Investors' Rights Agreement, which were versions of the Offering Documents intended to be used in connection with INR's purported Series A preferred stock offering.

89. On information and belief, the draft of the PPM sent by Flanagan to Bovee on or about August 29, 2022, at approximately 8:25 p.m., was similar to the

draft of the PPM sent by Bovee to Flanagan earlier that day, at approximately 4:58 p.m., with no substantive revisions made in the later draft.

90. On information and belief, the draft of the Subscription Agreement sent by Flanagan to Bovee on or about August 29, 2022, at approximately 8:25 p.m., was similar to the draft of the Subscription Agreement previously sent by Flanagan to Bovee on or about August 27, 2022, with no substantive revisions made in the later draft.

91. On information and belief, the draft of the Stockholders Agreement sent by Flanagan to Bovee on or about August 29, 2022, at approximately 8:25 p.m., differed from the draft of the Stockholders Agreement sent by Bovee to Flanagan earlier that day, at approximately 4:37 p.m., and had a number of revisions, including that additional information in Schedule A regarding the initial stockholders of INR was added, listing out the following individuals as holding the following number of shares of common stock: (1) Garcia, with 500,000 shares, (2) William, with 1,020,000 shares, (3) Nash, with 160,000 shares, (4) Benton, with 160,000 shares, and (5) Lavego, with 160,000 shares. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Stockholders Agreement to Bovee.

92. On information and belief, the draft of the Investors' Rights Agreement sent by Flanagan to Bovee on or about August 29, 2022, at approximately 8:25 p.m., differed from the draft of the Investors' Rights Agreement previously sent by Flanagan to Bovee on or about August 27, 2022, and had a number of revisions, including that the Disclaimer was deleted. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Investors' Rights Agreement to Bovee.

**8. August 29, 2022, at 10:51 p.m.: Flanagan Sends Drafts of Four Offering Documents (Relating to Series B Offering) to Bovee.**

93. On information and belief, on or about August 29, 2022, at approximately 10:51 p.m., Flanagan, using his personal email address, sent an email to Bovee, in which he attached drafts of the (a) PPM, (b) Subscription Agreement, and (c) Stockholders Agreement, which were versions of the Offering Documents intended to be used in connection with INR's purported Series B preferred stock offering. On information and belief, in this email, Flanagan also wrote, "Series B will not require the Investor rights agreement," which was why he did not attach a draft of the Investors' Rights Agreement in this email to Bovee.

94. On information and belief, the draft of the PPM sent by Flanagan to Bovee on or about August 29, 2022, at approximately 10:51 p.m., differed from the draft of the PPM sent by Flanagan to Bovee earlier that day, at approximately 8:25 p.m., and had a number of revisions, including the following: (a) every mention of "Series A" was replaced with "Series B," and (b) 8% was added as the annual rate of the "Original Issue Price" of a share of Series B preferred stock used in calculating the dividend thereof. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the PPM to Bovee.

95. On information and belief, the draft of the Subscription Agreement sent by Flanagan to Bovee on or about August 29, 2022, at approximately 10:51 p.m., differed from the draft of the Subscription Agreement sent by Flanagan to Bovee earlier that day, at approximately 8:25 p.m., and had a number of revisions, including that every mention of "Series A" was replaced with "Series B." On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the Subscription Agreement to Bovee.

96. On information and belief, the draft of the Stockholders Agreement sent by Flanagan to Bovee on or about August 29, 2022, at approximately 10:51 p.m., was the same draft of the Stockholders Agreement sent by Flanagan to Bovee earlier that day, at approximately 8:25 p.m.

**9. <u>August 30, 2022, at 8:42 a.m.: Flanagan Sends Draft of PPM to Bovee.</u>**

97. On or about August 30, 2022, at approximately 8:42 a.m., Flanagan sent an email to Bovee, which attached a "Version 2" draft of the PPM that was intended to be used in connection with INR's purported Series B preferred stock offering. The draft of the PPM sent by Flanagan to Bovee at this time differed from the draft of the PPM sent by Flanagan to Bovee on or about August 29, 2022, at approximately 10:51 p.m., and had one revision where the annual rate of the "Original Issue Price" of a share of Series B preferred stock used in calculating the dividend thereof was changed from 8% to 2%. On information and belief, Flanagan was the person who had made this revision before sending this revised draft of the PPM to Bovee.

98. On or about August 30, 2022, at approximately 9:52 a.m., Bovee sent an email to Flanagan, attaching a draft of the PPM and stating, "What's the diff on these? I have to redo every field for sign, date, etc. what did you change?" The draft of the PPM sent by Bovee to Flanagan at this time was the same draft of the PPM sent by Flanagan to Bovee earlier that day, at approximately 8:42 a.m.

**10. <u>August 30, 2022, at 12:06 p.m.: Flanagan Sends Drafts of PPM to Bovee.</u>**

99. On or about August 30, 2022, at approximately 12:06 p.m., Flanagan sent an email to Bovee, which attached two drafts of the PPM, one that was intended to be used in connection with INR's purported Series A preferred stock offering and the other that was intended to be used in connection with INR's purported Series B preferred stock offering.

100. The draft of the PPM for the Series A preferred stock offering that was sent by Flanagan to Bovee on or about August 30, 2022, at approximately 12:06 p.m., differed from the draft of the PPM previously sent by Flanagan to Bovee on or about August 29, 2022, at approximately 8:25 p.m., and had a number of revisions, including that CFO was added as an additional title for Williams. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the PPM to Bovee.

101. The draft of the PPM for the Series B preferred stock offering that was sent by Flanagan to Bovee on or about August 30, 2022, at approximately 12:06 p.m., differed from the draft of the PPM sent by Flanagan to Bovee earlier that day, at approximately 8:42 a.m., and had a number of the same revisions, including that that CFO was added as an additional title for Williams. On information and belief, Flanagan was the person who had made these revisions before sending this revised draft of the PPM to Bovee.

**11. <u>August 31, 2022: Flanagan Sends Drafts of Four Offering Documents to Everage.</u>**

102. On information and belief, on or about August 31, 2022, Flanagan and Everage communicated with each other about how the drafts of the Offering Documents needed to be finalized, and the two of them assisted each other in reviewing the current drafts. Over the course of that reviewing process between Flanagan and Everage, the two had the following text-message exchange:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

**8/31/2022 9:02 AM (Viewed 8/31/2022 9:23 AM)**

Kevin - Work (7257245587)

Call me back loser

**8/31/2022 9:47 AM**

Kevin - Work (7257245587)

Send the docs

**8/31/2022 9:48 AM**

Ryan's iPhone (+18504207571)

Let me get out of my car.

**8/31/2022 10:09 AM**

Ryan's iPhone (+18504207571)

Sent

**9/2/2022 10:26 AM**

Ryan's iPhone (+18504207571)

How's review coming?

**9/2/2022 10:29 AM (Viewed 9/2/2022 10:30 AM)**

Kevin - Work (7257245587)

Shit's dense. Trying to dump this off on you by the end of today

**9/2/2022 10:30 AM**

Kevin - Work (7257245587)

Regardless I'll send you the ones I'm done with

**9/3/2022 9:12 AM**

Ryan's iPhone (+18504207571)

What time are good for today?

**9/3/2022 9:45 AM (Viewed 9/3/2022 9:46 AM)**

Kevin - Work (7257245587)

1130?

**9/3/2022 9:46 AM**

Ryan's iPhone (+18504207571)

Perfect

103. On information and belief, on or about August 31, 2022, Flanagan sent an email to Everage, in which he stated, "Please see the attached documents for review," and then attached drafts of the (a) PPM, (b) Subscription Agreement, (c) Stockholders Agreement, and (d) Investors' Rights Agreement, which were versions of the Offering Documents intended to be used in connection with INR's purported Series A preferred stock offering.

104. On information and belief, the draft of the PPM sent by Flanagan to Everage on or about August 31, 2022, was the same draft of the PPM previously sent by Flanagan to Bovee on or about August 30, 2022, at approximately 12:06 p.m.

105. On information and belief, the draft of the Subscription Agreement sent by Flanagan to Everage on or about August 31, 2022, was similar to the draft of the Subscription Agreement previously sent by Flanagan to Bovee on or about August 29, 2022, at approximately 8:25 p.m., with no substantive revisions made in the later draft.

106. On information and belief, the draft of the Stockholders Agreement sent by Flanagan to Everage on or about August 31, 2022, was the same draft of the Stockholders Agreement previously sent by Flanagan to Bovee on or about August 29, 2022, at approximately 8:25 p.m.

107. On information and belief, the draft of the Investors' Rights Agreement sent by Flanagan to Everage on or about August 31, 2022, was the same draft of the Investors' Rights Agreement previously sent by Flanagan to Bovee on or about August 29, 2022, at approximately 8:25 p.m.

### 12. September 2, 2022: Everage Sends Drafts of Subscription Agreement, Stockholders Agreement, and Investors' Rights Agreement to Flanagan.

108. On or about September 2, 2022, Everage sent an email to Flanagan, which attached drafts of (a) Subscription Agreement, (b) Stockholders Agreement, and (c) Investors' Rights Agreement and with Everage then stating, "Probably won't finish the PPM today but wanted to send you these so you can jump in rather than hold everything up. Also, we could probably sort a lot of this out by running through it together on a shared screen."

109. The draft of the Subscription Agreement sent by Everage to Flanagan on or about September 2, 2022, differed from the draft of the Subscription

Agreement previously sent by Flanagan to Everage on or about August 31, 2022, but, instead of substantive revisions, a number of comments or questions addressed to specific portions therein were added. Those comments or questions included (a) "Check consistency with other docs," addressed to the purchase price of $1,000 per share for the offering, (b) "Does this need to be updated in light of recent events?" addressed to the following passage:

> The Company has not employed any investment banker, broker or finder or incurred any actual or potential liability or obligation, whether direct or indirect, for any brokers' fees or finders' fees in connection with the transactions contemplated by the Documents, for which any Subscriber may be liable[,]

(c) "Do we want to edit this?" addressed to the section addressing INR's compliance with applicable cannabis laws, (d) "Why Nevada and not Delaware? Other documents use Delaware," addressed to the governing law provision, and (e) "This is inconsistent with the agreement and needs a carve-out above," addressed to the questionnaire for non-accredited investors. On information and belief, Everage was the person who had added these comments or questions before sending this annotated draft of the Subscription Agreement to Flanagan.

110. The draft of the Stockholders Agreement sent by Everage to Flanagan on or about September 2, 2022, also differed from the draft of the Stockholders Agreement previously sent by Flanagan to Everage on or about August 31, 2022, but, instead of substantive revisions, a number of comments or questions addressed to specific portions therein were added. Those comments or questions included (a) "Inconsistent with Schedule A. Schedule A only allocates 2,000,000 shares," addressed to the recital that INR has issued 2 billion shares of common stock, (b) "Seems off. Does one of these statement encompass the other?" addressed to the definition of "Supermajority Approval" that states "the unanimous written consent of the Stockholders/written consent of the Stockholders holding at least 66 2/3% of the issued and outstanding Shares," (c) "This seems extremely limiting for business operations if a Supermajority vote is required unless the initial investors

will continuously hold a Supermajority," addressed to the "Supermajority Approval" of stockholders required for INR to take certain actions, (d) "Too much flexibility?" addressed to the forum selection provision providing that any dispute be brought in the U.S. District Court for the District of Nevada or the Chancery Court of the State of Delaware, and (e) "Maybe include an Arbitration clause?" addressed to the jury waiver provision. On information and belief, Everage was the person who had added these comments or questions before sending this annotated draft of the Stockholders Agreement to Flanagan.

111. The draft of the Investors' Rights Agreement sent by Everage to Flanagan on or about September 2, 2022, also differed from the draft of the Investors' Rights Agreement previously sent by Flanagan to Everage on or about August 31, 2022, but, instead of substantive revisions, a number of comments or questions addressed to specific portions therein were added. Those comments or questions included (a) "Make sure this is consistent with the shares granted under the stockholders agreement," addressed to the definition of "Major Investor" that provides that such investor holds at least 10 million shares, (b) "Not a fan of this term. Unless it contemplates an IPO," addressed to the use of "Registrable Securities," (c) "Self-defined. Refer to other agreement?" addressed to the use of "Series A Preferred Stock," (d) "Preferred Stock isn't a defined term," addressed to the use of "Preferred Stock," and (e) "Undefined," addressed to the use of "Transaction Documents" and "Purchase Agreement." On information and belief, Everage was the person who had added these comments or questions before sending this annotated draft of the Investors' Rights Agreement to Flanagan.

**13. <u>September 3, 2022, at 11:39 a.m.: Flanagan Virtually Meets with Everage.</u>**

112. On information and belief, on or about September 3, 2022, beginning at approximately 11:39 a.m., Flanagan and Everage participated in a Zoom meeting, in which they thoroughly discussed the current drafts of the Offering Documents.

113. On information and belief, Flanagan and Everage effectively excluded Gilligan, July, Crow, and other Dickinson Wright attorneys from this meeting and from their exchange of drafts of the Offering Documents, with Flanagan knowing that the involvement of any other Dickinson Wright attorney would likely raise questions and concerns that would hinder or prevent them from finalizing the Offering Documents and thus INR's ability to get the Offering Documents in front of investors. On information and belief, Flanagan and Everage proceeded in this manner, despite knowing that they themselves were (a) not experienced or qualified securities attorneys, (b) only junior-level associate attorneys at that time, and (c) not involved in the initial principal drafting of the Offering Documents.

**14. <u>September 3, 2022, at 2:05 p.m.: Everage Sends Draft of PPM to Flanagan.</u>**

114. Following the meeting, that same day, at approximately 2:05 p.m., Everage sent an email to Flanagan, which attached a draft of the PPM. The draft of the PPM sent by Everage to Flanagan at this time differed from the draft of the PPM previously sent by Flanagan to Everage on or about August 31, 2022, but, instead of substantive revisions, a number of comments or questions addressed to specific portions therein were added. Those comments or questions included (a) "Verify. I pulled this from the wire instructions," addressed to the address of INR's principal office, (b) "I thought Series A didn't have Voting Rights?" addressed to the PPM's summary of a stockholder's voting rights, and (c) "Retirement of outstanding loan obligations?" addressed to the PPM's summary of the use of the proceeds from the offering for "Real estate, Buildout of Facilities, Equipment." On information and belief, Everage was the person who had added these comments or questions before sending this annotated draft of the PPM to Flanagan.



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

### G. Murchison's Finalization of the Offering Documents.

115. On information and belief, following the receipt of Everage's September 3, 2022, email, Flanagan did not circulate further drafts of the Offering Documents to any Dickinson Wright attorney (including Everage) for their further review or input and proceeded to finalize the Offering Documents himself so that they could finally be dissemination to investors. On information and belief, in the end, the only attorneys who had reviewed the near-final and final versions of the Offering Documents before they were disseminated to investors were Flanagan and Everage. On information and belief, Flanagan, rather than any attorney at Dickinson Wright, made the final determination that the Offering Documents were ready to be disseminated to investors.

116. The draft of the PPM finalized and then disseminated to investors differed from the draft of the PPM sent by Everage to Flanagan on or about September 3, 2022, and had a number of revisions, including the following: (a) the number of shares of Series A preferred stock that INR was offering as part of its offering was changed from 60 million to 5 million, with the par value of each share also changed from $0.00001 to $0.0001, (b) 8% was added as the annual rate of the "Original Issue Price" of a share of Series A preferred stock used in calculating the dividend thereof, (c) the following summary of a stockholder's voting rights was entirely deleted:

> On any matter presented to the stockholders of the Company for their action or consideration at any meeting of stockholders of the Company (or by written consent of stockholders in lieu of meeting), each holder of outstanding shares of Preferred Stock shall be entitled to cast the number of votes equal to the number of whole shares of Common Stock into which the shares of Preferred Stock held by such holder are convertible as of the record date for determining stockholders entitled to vote on such matter. Except as provided by law or by the Certificate, holders of Preferred Stock shall vote together with the holders of Common Stock as a single class and on an as-converted to Common Stock basis[,]

and (d) the following passage was entirely deleted from the risk factors section:



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP ATTORNEYS AT LAW

> ***The Company does not intend to pay dividends on the Preferred Stock or the Company's common stock.***
>
> The Company, for the foreseeable future, intends to deploy its financial resources toward the growth and development of its operations and does not intend to pay cash dividends on its Preferred Stock. Instead, upon redemption or conversion of the Preferred Stock the accumulated dividends payable thereon will be factored into the redemption price or the number of shares of the Company's common stock, as the case may be.
>
> Any future payments of cash dividends, and the amount of any cash dividends the Company pays, on the common stock will depend on, among other things, the Company's financial condition, capital requirements and results of operations, and the ability of the Company's subsidiaries and investments to distribute cash to the Company, as well as other factors that the Company's Board may consider relevant. In addition, the Company's ability to pay dividends in the future may be restricted by the Company's future credit facilities, indentures or other financing agreements.
>
> In addition, under applicable Delaware law, the Company's Board (or an authorized committee thereof) may only declare and pay dividends on shares of the Company's capital stock out of the Company's statutory "surplus" (which is defined as the amount equal to total assets minus total liabilities, in each case at fair market value, minus statutory capital), or if there is no such surplus, out of the Company's net profits for the then current and/or immediately preceding fiscal year. Further, even if the Company is permitted under its contractual obligations and Delaware law to declare and pay cash dividends on the shares of common stock, the Company may not have sufficient cash to do so.

On information and belief, Flanagan was the person who had made these revisions while he was finalizing the draft of the PPM.

117. On information and belief, the draft of the PPM finalized by Flanagan and then disseminated to investors also contained various material misrepresentations, omissions, or inconsistencies that were known to Flanagan, including, without limitation, that (a) there was no mention in the PPM of INR's issues with the Original Investor Agreements and its inability to make payments thereunder in the risk factors section or otherwise, (b) the PPM stated that INR "had outstanding consolidated debt of approximately $649,828" as of December 31, 2021, seemingly omitting from that figure INR's debts owed to investors under the Original Investor Agreements, (c) the PPM did not indicate that any proceeds from

the offering would be used to make payments to investors under the Original Investor Agreements, (d) the PPM, in one part, stated that INR “is offering a minimum of 1,000 and a maximum of 60,000 shares of Series A Preferred Stock,” and then, in another part, stated that the “securities offered” were “5,000,000 shares of the Company's Series A Participating Preferred Stock,” (e) the PPM suggested that INR owns a cannabis facility by stating, “Opportunity arose in Nevada in 2014 as the Company invested in a 52,000 square foot grow facility,” and (f) the PPM makes no mention of the Series B preferred stock that INR may also be offering.

118. The draft of the Subscription Agreement finalized and then disseminated to investors differed from the draft of the Subscription Agreement sent by Everage to Flanagan on or about September 2, 2022, and had a number of revisions, including the following: (a) the provision providing that INR “has not employed any investment banker, broker or finder or incurred any actual or potential liability or obligation, whether direct or indirect, for any brokers’ fees or finders’ fees in connection with the transactions contemplated by the Documents, for which any Subscriber may be liable” was deleted, (b) the governing law for construing the Subscription Agreement was changed from Nevada law to Delaware law, and (c) the forum selection provision was changed from “the state courts of Nevada” to “the state courts of Delaware” (while failing to delete “sitting in the County of Clark”). On information and belief, Flanagan was the person who had made these revisions while he was finalizing the draft of the Subscription Agreement.

119. The draft of the Stockholders Agreement finalized and then disseminated to investors differed from the draft of the Stockholders Agreement sent by Everage to Flanagan on or about September 2, 2022, and had a number of revisions, including the following: (a) a recital indicating that INR has issued 5 million shares of Series A preferred stock and 5 million shares of Series B preferred stock was changed to state that INR “may issue up to” 5 million shares of



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

Series A preferred stock and 5 million shares of Series B preferred stock, (b) the "Supermajority Approval" of stockholders required for INR to take certain actions was changed to "majority Approval" (with no definition provided for "majority Approval" or "Approval"), (c) "make any loan or advance to, or a capital contribution or investment in, any Person" and "enter into a merger, consolidation, interest exchange, or sale, lease, exchange, or other disposition of all or substantially all of the Company's assets" were deleted from the list of INR actions requiring approval from stockholders, (d) the alternative dispute resolution provision from the Subscription Agreement was added (without updating the internal section or paragraph references made therein), (e) the spousal consent provision, as well as spousal consent form (included as Exhibit B to the Stockholders Agreement), was deleted, and (f) the information in Schedule A regarding the initial stockholders of INR was changed to reflect that (1) Garcia held 500 million shares (from 500,000), (2) William, held 1.02 billion shares (from 1.02 million), (3) Nash held 160 million shares (from 160,000), (4) Benton held 160 million shares (from 160,000), and (5) Lavego held 160 million shares (from 160,000). On information and belief, Flanagan was the person who had made these revisions while he was finalizing the draft of Stockholders Agreement.

120. The draft of the Investors' Rights Agreement finalized and then disseminated to investors differed from the draft of the Investors' Rights Agreement sent by Everage to Flanagan on or about September 2, 2022, and had a number of revisions, including the following: (a) any mention of the Series B preferred stock was deleted and "Preferred Stock" was then defined to mean the Series A preferred stock, (b) the prior dispute resolution provision, which provided that the parties submitted to the jurisdiction of the Delaware state courts, was replaced with the alternative dispute resolution provision from the Subscription Agreement (without updating the internal section or paragraph references made therein), and (c) a broad release provision in favor of INR was added. On information and belief, Flanagan

was the person who had made these revisions while he was finalizing the draft of the Investors' Rights Agreement.

121. On information and belief, in the end, Flanagan had made numerous revisions to the drafts of the Offering Documents that added, deleted, or otherwise changed the provisions therein. Those revisions included, without limitation, (a) deleting the Disclaimer in multiple Offering Documents, (b) changing the number of shares of common stock, Series A preferred stock, and Series B preferred stock that INR could issue, (c) creating the class of Series B preferred stock and the provisions relating thereto, (d) changing the terms of INR's proposed offering, including the number of shares being offered, the par value of such shares, (e) changing the terms for how the dividend for preferred stock was calculated, (f) changing the terms of the conversion of preferred stock to common stock, (g) identifying the initial stockholders and providing their ownership stakes, (h) identifying the initial directors and providing their titles or roles (including adding CFO as an additional title for Williams), (i) removing the provision providing voting rights to holders of Series A preferred stock, (j) deleting the provision providing that INR has not employed any investment bankers, brokers, or finders, (k) removing the discussion that INR may not pay dividends from the risk factors section of the PPM, (*l*) changing the governing law, forum selection, and dispute resolution provisions, (m) removing the spousal consent provision and form, (n) changing the provisions addressing stockholder approval of certain acts by INR, including reducing such approval from a supermajority to a simple majority and removing certain acts from requiring such approval, and (o) adding a broad release provision in favor of INR.

122. As a result of Flanagan's extensive and substantive work on the Offering Documents, the initial form drafts of the documents with numerous blanks needing to be filled in (and thus not ready to be sent out to investors) became final versions that were ultimately disseminated to investors but which contained false

and misleading and sometimes internally inconsistent statements. Investors were then led to believe the Offering Documents had been prepared and vetted by a long-standing, well-respected law firm that was representing INR, when, in fact, Murchison had inexplicably allowed a junior associate with no experience in securities law to prepare critical and complex securities transactional documents with absolutely no supervision.

### H. Murchison's Dissemination of the Offering Documents to Investors.

123. On information and belief, Flanagan began to send out the Offering Documents to investors starting on or about September 4, 2022 (i.e., the day following his receipt of Everage's September 3, 2022, email). In each such email to an investor, Flanagan attached the Offering Documents (personalizing each set of the Offering Documents with the applicable information for that investor, such as by identifying their name, address, Original Investor Agreements, and amounts invested thereunder) and requested that the investor review and execute the Offering Documents. In addition, in each such email to an investor, Flanagan also copied Bovee at her INR email address (aia.montgomery@inr.green), which identified her name as "Aia Montgomery."

124. On information and belief, on that first day of disseminating the Offering Documents to investors, Flanagan emailed the Offering Documents to seven investors. In the end, on information and belief, Flanagan directly emailed the Offering Documents to approximately (a) 90 investors in or about September 2022, (b) 82 investors in or about October 2022, (c) two investors in or about December 2022, and (d) two investors in or about February 2023, or approximately 176 investors total. On information and belief, of the investors to which Flanagan emailed the Offering Documents, the majority of them were investors being requested to convert their debt to equity, but some of them were new investors who were being solicited to invest in INR for the first time.

125. On information and belief, with respect to those new investors (who would be investing in INR for the first time) who received the Offering Documents, they either received the Offering Documents from Flanagan or from someone at INR (i.e., Bovee or one of the Scheme Principals). On information and belief, while Flanagan did not directly email the Offering Documents to all of the new investors, Flanagan nevertheless prepared the applicable Offering Documents for those investors that were later sent to them by INR. As reflected in Flanagan's recorded billing entries, the substantial majority of his billing entries and billed time in December 2022 through March 2023 was for "compos[ing]" or "draft[ing] corporate contracts," which, on information and belief, refers to the Offering Documents. On information and belief, the drafts of these sets of the Offering Documents were not exchanged between Flanagan and Bovee by email (at least not to or from Flanagan's Murchison email address), but the two exchanged drafts with one another by physically exchanging a USB flash drive between them, which flash drive contained those drafts.

126. On information and belief, Flanagan ultimately did not inform any Dickinson Wright attorneys that Murchison had finalized the Offering Documents or had begun disseminating them to investors until the Offering Documents had already been received by dozens of investors. In other words, on information and belief, Murchison, rather than Dickinson Wright, was the law firm who made the final determination that the Offering Documents were ready to be disseminated to investors.

127. On or about September 19, 2022, Flanagan finally responded to Gilligan's August 12, 2022, email (where Gilligan was following up with Flanagan on the current status of the Offering Documents), with Flanagan attaching the finalized versions of the PPM, Subscription Agreement, Stockholders Agreement, and Investors' Rights Agreement and then stating the following: "We have the following contract ready for investors. Besides the contracts, is there any other

filing we will need to accomplish? Form D or anything with the SEC?" While Gilligan's August 12, 2022, email to Flanagan had copied July and Crow, Flanagan's September 19, 2022, email to Gilligan in response thereto only copied Everage (i.e., Flanagan removed July and Crow from the email chain).

128. Flanagan, in his September 19, 2022, email to Gilligan, did not immediately mention to Gilligan that the Offering Documents had already been sent out to investors, and, on information and belief, Gilligan, at that time, did not realize that. In response to Flanagan's email, that same day, Gilligan sent an email to Flanagan, which stated the following: "Yes – you'll need to file a Form D with the SEC and notice filings in each state where an offer is made. Would you like me to prepare those? And do you need me to review the agreements before they go out?" On information and belief, at that time, Gilligan believed that the Offering Documents were not yet ready to be disseminated to investors.

129. Later that day, in an email to Flanagan, Gilligan asked Flanagan, "Have you made any sales yet? I just need to know the states where it will be offered and the amounts offered in each state." In an email back to Gilligan that same day, Flanagan responded, "They have been getting a hold of the investors and getting some signatures for the transfers." On information and belief, Flanagan declined to accurately inform Gilligan that Flanagan himself had already sent out the Offering Documents to dozens of investors by that point. On information and belief, this was the first time that a Dickinson Wright attorney became aware that INR had already begun sending the Offering Documents to investors.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

130. On information and belief, Crow similarly did not know the status of the Offering Documents until Everage informed him on or about October 5, 2022. On that date, Everage and Flanagan had the following text-message exchange:




131. In the end, on information and belief, Flanagan acted as more than a scrivener or messenger of the Offering Documents; in other words, Flanagan did not merely input the applicable information about an investor (e.g., the name and the amount that they had invested in INR) into the Offering Documents, and he also did not merely transmit the Offering Documents to the investor. Rather, on information and belief, Flanagan not only provided significant input to the substance of the Offering Documents (as reflected above), but also acted as a representative of INR who provided information directly to investors regarding INR's purported offering.

132. For example, on information and belief, on or about September 30, 2022, Flanagan sent the following email to investor J. Armstrong:

> The Company is raising 60M for additional expansions. Additionally, the Company is restructuring its debt to equity and giving you the opportunity to become a shareholder and owner of the Company. The contracts sent to you outline the equity position you would hold with the company along with your rights and safeguards. The PPM, the Certificate of the Company, and the Bylaws gives you information for your due diligence and how the Company will use the funds it raises.

133. As another example, investor C. Spector indicated that, in or about late 2022, he reached out to Flanagan to express his concerns about his investment in INR after running person searches on the Scheme Principals and being unable to find any information about them from those searches. Per that investor, Flanagan reassured him that this was a legitimate investment opportunity and that Flanagan had, in fact, met the Scheme Principals and seen INR's books.

134. And, as another example, investor P. Dale spoke with Flanagan on the phone regarding the proposed debt-to-equity conversion, during which Flanagan represented to the investor that INR's people had built a great business, that INR wanted to go public (and thus the shares to be received by the investor would become valuable), and that the investor was going to be a partner in this venture.

135. On information and belief, certain of the investors that interacted with Flanagan, including investor C. Spector, were willing to accept Flanagan's representations regarding INR and its legitimacy because Murchison was a legitimate, long-standing, and well-respected law firm. Indeed, unlike any of the Scheme Principals, information regarding Murchison and Flanagan could be found on the internet. Furthermore, Flanagan was able to communicate the legitimacy of Murchison in his emails to investor as his email signature indicated that Murchison was "celebrating 90 years" of its existence and had six offices across California and Nevada.

### I. Murchison's Knowledge of the Fraudulent Nature of the Scheme and the Representations Made to Investors.

136. On information and belief, at one point during Murchison's representation of INR (potentially as early as September 2022), Flanagan and Murchison (through him) became aware of the fraudulent nature of the Scheme, primarily through Flanagan's interactions with Garcia and third parties (such as investors), which raised numerous red flags about the legality or legitimacy of the Scheme. On information and belief, rather than further investigating those red flags

(which would have confirmed that INR's investment program was a fraud), Flanagan chose to (a) look the other way when those red flags arose, (b) blindly accept and not challenge anything that Garcia directed him to do or not do, and (c) continue rendering legal services to INR, including continuously preparing the Offering Documents to be sent out to investors.

### 1. **<u>Flanagan Reads About a Ponzi Scheme Involving Investor Agreements.</u>**

137. On or about March 10, 2022, Flanagan had the following text-message exchange with Everage:



3/10/2022 10:27 AM
Ryan's iPhone (+18504207571)
There was a Ponzi scheme in Vegas based on investor contracts… I had to read the artless VERY carefully.

3/10/2022 10:27 AM
Ryan's iPhone (+18504207571)
But they had a 90 return on investment. I was like

3/10/2022 10:35 AM
Ryan's iPhone (+18504207571)
90 day

3/10/2022 10:41 AM (Viewed 3/10/2022 10:48 AM)
Kevin - Work (7257245587)
Is this related to your one guys

3/10/2022 10:48 AM
Ryan's iPhone (+18504207571)
No, but it did make my heart jump a bit. Lol

3/10/2022 10:49 AM
Kevin - Work (7257245587)
Why are you a magnet for the shady shit lmao

3/10/2022 10:50 AM
Ryan's iPhone (+18504207571)
That I feel is a universal mystery

On information and belief, in or about early March 2022, Flanagan read about an alleged Ponzi scheme that involved the use of investor agreements (i.e., agreements that were structured somewhat similarly to the Original Investor Agreements) and, at that point, became aware of what a Ponzi scheme could potentially look like.

**2. Flanagan Learns that INR's Success Was Above Average Notwithstanding the Irregularities of Its Operations.**

138. On information and belief, in or about June 2022, Flanagan spoke with a Murchison attorney specializing in cannabis law about INR, during which Flanagan discussed INR's background and circumstances. On information and belief, the Murchison attorney informed Flanagan that notwithstanding all of INR's irregularities in how it purportedly operated (e.g., relying on handshake deals for major transactions), INR's success as a cannabis company was "above average." On information and belief, Flanagan informed Everage on or about June 17, 2022, about his conversation with this Murchison attorney in the following text-message exchange:

> **6/17/2022 1:55 PM**
> Ryan's iPhone (+18504207571)
> So talking to our law firm's cannabis attorney, his shit is not unique and super normal, the hand shake deals. The shells, the management structuring
>
> **6/17/2022 1:55 PM**
> Ryan's iPhone (+18504207571)
> However, the success is above average
>
> **6/17/2022 1:56 PM**
> Ryan's iPhone (+18504207571)
> If we can get him in structured management contracts. The moon isn't the ceiling
>
> **6/17/2022 2:25 PM**
> Kevin - Work (7257245587)
> That's hella relieving
>
> **6/17/2022 2:26 PM**
> Ryan's iPhone (+18504207571)
> I thought you might feel some relief

On information and belief, Flanagan's conversation with this Murchison attorney raised red flags about the legitimacy of INR's purported operations, which Flanagan elected to disregard.



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP ATTORNEYS AT LAW

### 3. Flanagan Sees INR's Highly Suspect Responses to Commonly Asked Questions.

139. On or about August 18, 2022, Garcia sent Flanagan an email, in which he stated, "Hope this helps," and attached a document listing a series of questions and answers. On information and belief, Garcia (or another Scheme Principal) had prepared this document to set forth canned responses that INR would provide to commonly asked questions or requests. These questions and answers included the following:

***Lack of google results (BEFORE ALL THE PRESS)***

- Yes, the actual corporate names don't really produce a lot of results with Google. This is primarily the corporate structure, and (the names) are not used for retail marketing.

  We are currently working on a new website that will include much more content. In the meantime, we encourage investors to visit us in Las Vegas for a tour of our facility and one of our local dispensaries.

  I hope this helps. Let me know if you have any additional questions.

***High rates / no regular bank loans***

- High rates can be a red flag to most, understood. Cannabis is still considered a controlled substance on a federal level in the USA. Because of this, our industry cannot borrow from chartered banks. Market demand for capital is very competitive, and has ultimately boosted the rates beyond standard credit card (borrowing) rates. While this is not the most desirable for our industry, we do have high profit margins to be able to afford such a hefty fee schedule. The overall debt load represents 10% of gross revenue.

  With that said, recreational cannabis is continuously becoming more accepted state by state, and the prognosis is good for federal acceptance. When that happens, we will end private offerings and enjoy normal bank rates. However, the timing is the uncertain factor, and those who wait do not grow now. This industry is still in its infancy, and we must evolve quickly or lose out market share.

  This does not mean our rates will remain the same indefinitely. As funding continues, we will adjust (lower) our rates to balance with supply / demand. Simply stated, early investors will get the best return.

***Site Visits / Can't even find the company anywhere.***

- Please see page 17 in the memorandum (Get To Know Us), and feel free to check with the Wyoming Secretary of State to see how long we have been in business.

  Also as stated on page 17 of the memorandum as well we do have an Open Door Policy.

***This a scam***

- I looked at the links that you sent and it's not even referring to the proper company. Before you go that direction you should do your research correctly we are a Wyoming corporation not a California corporation. Also, we do not sell "weed" under the WCDEV label.

  With that said feel free to check out our company at the Wyoming Secretary of state as well as on page 17 of the memorandum it states we have an open door policy. Investors are welcomed to walk through 52,000 square feet of cultivation.

  Regardless I wish you the best and before assumptions become accusations please complete full due diligence.

***possibility of bankruptcy***

- For your second question (not that we are even close, or ever planning such an event), Investors are in the 1st position as the company carries no debt. Our facility in Las Vegas is 100% paid (at a cost of $20MM). You are welcome to visit our facility anytime and meet with myself and other principals of the company (advance booking is required). As for the Adelanto facility, we are raising 50% of funds required with the remaining balance funded internally by revenue and cash reserves. Even with the higher interest rates offered to investors, the debt load still only represents 10% of gross revenue. A bargain considering the expansion projections and expedited timeline.

***Asks for Licenses***

- We have dozens of licenses across the two states including (but not limited to) cultivation and dispensaries. The company does not publish these documents for privacy and proprietary reasons. Alternatively, we do have an open door policy for all investors. You are more than welcome to visit us in Las Vegas. If you would like to visit, let me know and I can provide further details.

/ / /

/ / /

/ / /

/ / /



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP ATTORNEYS AT LAW

***scam, social media, securities***

- We are a private company with a private offering. To be clear, we are not selling securities. In respect to the Securities and Exchange Commission, this is clearly stated on the investor agreement sample (bottom of page 3).

  However, before we become mis-guided by random links on the internet (I cannot speak on behalf of other companies, reports, or online blogs), you must be aware that we have an open door policy, as mentioned on page 17 of the memorandum (Get to know us).

  You may also view our corporate history on the Wyoming Secretary of State website here https://wyobiz.wyo.gov/Business/FilingSearch.aspx
  - Please make sure to spell our full name correctly when conducting search (Integrated National Resources).

  …

  In regards to social media, the company makes no apologies. I understand the company has limited published information. We are very private in regards to online publishing, social media, etc. This is why investors come to visit us in person and make a decision based on the information provided and a site visit. We do not supply or publish additional information other than the materials provided, and our website.

***thoughts on selling in 5 years***

- No sale is set for any specific date. This industry is full of hungry VC's looking to buy out existing successful operators. Naturally everything is for sale at the right price. The company will hold off from any offers for at least 5 years. This is a minimum time frame to establish proper valuation. The company has no interest in selling the Adelanto facility for less than $125MM.

  We expect offers to be presented once the facility reaches maturity, and will only accept something that makes financial sense for the company and it's investors.

On information and belief, Flanagan reviewed the document attached to Garcia's email (Flanagan's recorded billing entry on August 18, 2022, stated, "Reviewed Q&A for broker provided by client; discussed same with client") but declined to further investigate the various obvious red flags raised by the content therein (e.g., why investors cannot find any information on INR on the internet, why INR needs to respond to questions about whether it is perpetrating a scam, why INR is unable to provide information about publicly available, government-issued licenses, why

INR continues to represent that it could sell one of its facilities).

**4. Flanagan Becomes Aware of INR's Questionable Recordkeeping About Investors and Their Investments.**

140. On or about August 19, 2022, Garcia sent Flanagan an email, in which he stated, "Examples of what the database looks like," and attached two documents. On information and belief, Garcia was providing Flanagan with examples of how INR tracked information regarding investors and their investments. However, on information and belief, the documents were sloppily prepared and organized and did not convey information in a manner that could be properly stored in any kind of database. For example, one document about investor J. Lopez was presented in the following manner:

7/8/2019
Bizbuysell 1 $$$
[redacted] Lopez
[redacted]@yahoo.com
(210) [redacted]
[redacted] TX

Max: Spoke to him on day 1, emailed back and forth, he asked about being an accredited investor, replied and asked him if he spoke with Mike, Mike called later that afternoon 7/11/19

MD: More Progress 2 weeks till $ is clear taking contract to attorney wife is accountant likes what she sees. Will sign contract and verify funds before he makes arrangements to come and visit us

July 24th Sent 10% jump text

9/14: emailed by inquiry form:
Hey max it's [redacted] we spoke about 2 months back I was interested. Give me a call.

9/14 Max called him, said he got his money ($500k) paid off his house, a couple cars and has $350k left that isn't making any money. Wants to invest. Saw our listing for investment starting at 10k, was curious, but told him he would get a better rate if he started at $25k. Also said we would honor the original rate. Said I would send him the updated memo explaining the diff between junior and senior programs. He said he'll look and call back later.

On information and belief, Flanagan reviewed the documents attached to Garcia's

email but did not call into question the inadequate manner in which INR, a company purporting to have assets valued in the nine figures, maintained records regarding its investors.

141. Similarly, on information and belief, Flanagan was aware that, due to INR's poor recordkeeping, investors on many occasions had to have the principal amounts of their investment corrected in the Offering Documents.

142. For example, from or about September 6, 2022, to or about October 11, 2022, Flanagan sent multiple versions of the Offering Documents to investor Blonde Lady Enterprises, LLC ("BLE") due to INR misstating BLE's investment amount (from $252,000 to $282,000 to another figure and then to $285,000. On or about October 5, 2022, the principal of BLE sent an email to Flanagan, in which he stated, "This amount is still not correct, and this is the third version." Flanagan then forwarded that email to Bovee and asked, "Do you know where he is getting his numbers from, because I do not." In the end, Flanagan updated the Offering Documents to reflect that BLE's investment amount was $285,000, which BLE signed off on.

143. As another example, on or about October 10, 2022, Flanagan received an email from investor T. Taylor, which stated,

> Our investment with INR is $200,000 not $100,000. We made an initial investment and followed up with another $100,000 August 30th.
>
> We have an addendum that accounting acknowledged, per Max Bergmann, showing our two separate investments
>
> The Taylor Agreement you included in the package of documents in regards to the restructuring only shows $100,000.

In response to this email, Flanagan updated the applicable Offering Documents to reflect an overall investment of $200,000 from investor T. Taylor.

144. And, as another example, on or about October 12, 2022, investor R. Esparza sent an email to Bovee and Flanagan, with subject line "Please correct investment amount," indicating that their Offering Documents did not reflect the

correct amount of their investment: "I attached the agreement signed by the Vice President and myself dated August 29th. My investment is 425K. The documents I received this morning indicate it's only $400k." In response thereto, Flanagan corrected the Offering Documents for this investor to reflect their principal of $425,000.

145. On information and belief, Flanagan never questioned why INR had provided him with the wrong figures on multiple occasions.

**5. Flanagan Realizes that INR Has Continued to Use the Original Investor Agreements.**

146. On or about September 30, 2022, Bovee forwarded to Flanagan an email purportedly sent by Hirschmann to her, in which Hirschmann stated the following regarding investor I. Armstrong:

> On the last statement(s) an error was discovered on [I. Armstrong's] last addendum (this guy always made shit confusing).
>
> Anyway, the statement is correct, but addendum 6 has incorrect values. I was going to correct this and re-send it to him.
>
> At this point I think it's moot, but wanted to point it out. I'm sure you have it figured out between addenda, statements and the master ledger.

In Bovee's email to Flanagan, Bovee also attached documents that were purportedly attached in Hirschmann's email to her. One of those attached documents was the *Investor Agreement Addendum* dated August 9, 2022, between INR and investor I. Armstrong, which was based on the form Investor Agreement Addendum that INR was told to stop using. On information and belief, Flanagan reviewed this document but declined to question why INR continued to use the Original Investor Agreements, particularly during the period when the Offering Documents were being prepared by Dickinson Wright and Murchison.

147. Similarly, on information and belief, on or about November 22, 2022, Garcia informed Flanagan that INR wanted to revert to using a form similar to the Original Investor Agreements. In response, on or about November 23, 2022,



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

Flanagan sent an email to Garcia, attaching an updated and revised draft of an Original Investor Agreement and stating the following: "If you still wanted to use this form here is my first draft. I will advise I would not use this in the current form until we have a securities attorney look it over. However, the changes I've made I believe are a good start." On information and belief, at that time, Flanagan was already aware that the Original Investor Agreements were problematic (which was the reason why the Offering Documents had been prepared), but he nevertheless complied with Garcia's request. On information and belief, after receiving the updated and revised version of the Original Investor Agreement prepared by Flanagan, INR did circulate that version of the Original Investor Agreement to investors.

**6. <u>Flanagan Sees INR's Problematic Financial Statements.</u>**

148. On or about October 4, 2022, Flanagan sent an email to Everage, in which he attached a copy of INR's purported financial statements in spreadsheet form and requested that Everage give him a call. These financial statements indicated the following:

- In the balance sheet, INR's assets had a total value of $110,007,264 as of September 2022;
- In the balance sheet, INR had cash in the amount of $19,198,009 as of September 2022;
- In the balance sheet, INR's liabilities totaled $2,212,779 as of September 2022;
- In the income statement, INR's monthly EBITDA margins were 57–58% from January to September 2022.

On information and belief, Flanagan had reviewed these financial statements but chose not to press INR on the various red flags raised therefrom, including (a) how can INR suggest it was having liquidity issues when it had $19 million in cash on hand, (b) how can INR's liabilities only total $2 million when it owed investors

significantly more under the Original Investor Agreements, and (c) how can a cannabis company have such absurdly high EBITDA margins.

149. On or about October 25, 2022, Flanagan emailed these financial statements to the attorney for investor C. Poland in response to his repeated requests for INR's financial statements.

**7. Flanagan Becomes Aware of Various Issues with the PPM and the Representations Made to Investors as Part of INR's Offering.**

150. On or about October 5, 2022, the attorney for investor C. Poland sent an email to Flanagan, stating the following in his request for more information about the proposed debt-to-equity transaction:

> [P]lease note that I have not received a response from you related to my email correspondence from Monday evening at 3:04am ET. If the company is asking my client to restructure her investment, it is important to confirm that we have a clear understanding of the restructured investment. Based upon the information you have provided, it appears that the investment is being restructured from a 32% return (plus a revenue sharing component) to an 8% return that will convert into a minuscule fraction of the company's common stock. That is a HUGE change in the economics of the investment.

151. On or about October 6, 2022, Flanagan responded to the attorney with the following via email:

> [I]t was stated or should have been stated to Ms. Poland that the company's outstanding common stock shares was in the process of being bought back to bring it in line with the PPM, and in September's board meeting the Company approved the buy-back so that only 2M not 2B of common stock is outstanding. I believe this brings in line on of your bigger concerns with the numbers not matching up from your previous email. Ms. Poland's online documents were already updated to reflect this change earlier in the week, attached is the updated PDF copy.
>
> …
>
> As far as compelling your client to accept the terms of the restructure, the Company is making every effort to incentivize signing of the current offering and terminate the high interest rate contracts. The new deal has many safeguards for investors that protect the investor that the old contracts just do not have.

On information and belief, prior to Flanagan's email, on either the recommendation of Dickinson Wright or Flanagan, INR had approved a stock buyback that had the effect of reducing the outstanding shares of common stock from 2 billion to 2 million. On information and belief, this was done to address an issue in the Offering Documents, where investors would receive very limited value in the event that their shares of Series A preferred stock converted to shares of common stock (i.e., with the reduction in the amount of outstanding shares of common stock, investors would receive more value in the event of a conversion).

152. On or about October 10, 2022, investor C. Poland sent an email to Bovee, who then forwarded that email to Flanagan the following day. In investor C. Poland's email, he stated the following:

> I'm writing to find out what exactly is happening with the company, our 'loan'/investment and why the details on the 'restructure program' you told us during our telephone conversation are nowhere in the 200+ pages of legal documents presented for signature.
>
> Specifically:
>
> 1. The numbers of shares the Board owns compared to the number of shares investors receive, which then will be automatically converted are highly diluted.
>
> 2. You told us we would receive shares 1:1 and it is so unusual, and yet, Mike Garcia insisted his investors be taken care of. That is not in the paperwork.
>
> 3. You stated the 8% was excellent because it would be 8% of the entire company value. The paperwork states that our current 32% interest on investment changes – quite dramatically to 8%! Furthermore, the dividend is optional. We had asked a question about this point following our call, and you have yet to reply.
>
> 4. You did you mention preferred shares will be forcibly/automatically converted to common shares once the company has raised 1M.
>
> As each of the documents suggests we consult a lawyer, etc, and as you are aware, we have consulted a lawyer, who you have 'met' through a stream of emails with Ryan. He is also a CPA, and is still awaiting a reply to his question to you regarding 15% of the company, since the PPM fails to address conversion rights. We've also requested financial statements and a cap table. Prior to signing our current contract the company was happy to provide such and seems to pride itself (or did) on complete transparency. Ryan has told us he does not have access and to ask you.

153. On or about October 12, 2022, investor C. Poland followed up with another email to Bovee and Flanagan, in which he stated the following:

> Again, we are open to discussion of the facts if we have misunderstood them. Not looking to debate, we are just not seeing much of what was promised verbally show up in the documents.
>
> 1. In your email of September 27, 2002, you stated "In this case, up to fifteen percent of the total value of the company is being offered in shares for a total of up to 60 million dollars worth of equity. Share value - as in the listing price which is a piece of the market cap formula is not calculated until immediately before the IPO. That number is determined by the investment banking team. In a pre-IPO what is relevant is the total percentage of equity/dollar value – which is 60 million of 15%.
>
> a. Although we have asked several times, neither you nor your attorney has been able to support this statement based on the documents and, based on our calculations, the actual percentage interest of the preferred units appears to be closer to 8.25%. Therefore, for now, that appears to just be a material misrepresentation/misstatement on your part; it was even worse when there were 2 billion shares of common stock outstanding.
>
> 2. Also, in your email you noted that "In this case, the par value is the limit that the shares may be split to - as in 1/10,000 of their current value, which would leave the company with a total of X billion shares. At that point if the company needed to further split the shares in order to keep the price attractive after listing, it would require SEC approval. Many companies in growth sectors do it this way as it allows them to split the shares as often as needed after the IPO in order to keep the price of shares at an attractive dollar value without having to go back to the SEC and wait for approval which can take weeks or months."
>
> a. Can you provide any support for this statement? Neither we nor our counsel are familiar with this explanation of par value.
>
> …
>
> 4. Your counsel told us that the preferred stock could not be converted at a market price that would generate a loss for the preferred. We don't see that in the documents and note that the company will need to be worth more than $730 million in order for that to be the case.
>
> …
>
> 8. As for the PPM, our counsel is not very impressed by that document and has noted that it is "wildly insufficient" from a disclosure perspective. Among many of the deficiencies, the company has not detailed the public offering process that you have described to us and has provided absolutely no information on this October 15, 2022 deadline that keeps getting thrown out.

On information and belief, Flanagan did not respond to this email.

154. On or about October 14, 2022, the attorney for investor C. Poland followed up with Flanagan by email, stating the following:

> Any follow-up on this? We still have not received any financial information from the company. Not sure how the company expects my client to make an informed investment decision given the deficiencies in the PPM, the lack of additional information from the company and the company's failure to respond to basic questions (like how does the preferred convert into 15% to the company, which is what Aia said is the case).
>
> …
>
> This program seems to be based upon the company pushing investors to take action quickly and threatening them (with withdrawal status) if they fail to do so. It is hard to believe that the securities lawyers would recommend that as a reasonable course of action and if my client did convert to preferred stock I have concerns that other investors may sue the company for securities laws violations, which obviously could have an adverse impact on my client's investment. This definitely seems like the sort of behavior that class actions are made to address.

On information and belief, Flanagan, acknowledging that he did not know how to deal with these issues identified by the attorney, sought assistance from Gilligan.

155. On or about November 2, 2022, the attorney for investor C. Poland sent an email to Flanagan and Gilligan, in which he identified issues with the PPM and the other Offering Documents, as well as representations made by Bovee and Flanagan:

> Regarding the PPM, the document provides almost no information related to the preferred stock. The conversion features of the preferred are not summarized or even referred to in the PPM and the only references to the convertibility of the preferred stock are in the risk factors. Admittedly, if an investor bothers to dig through the Certificate of Incorporation, the features of the preferred stock are covered in that document, but the purpose of the PPM is to summarize the information for investors. On page 1 of the PPM, the offering purports to be for 60,000 shares of Series A Preferred Stock, but on page 4 the preferred stock is identified as Series A Participating Preferred Stock and is for a total of 5,000,000 shares.
>
> The PPM makes no reference to the exchange of the existing investor agreements or to the tax or other consequences of such an exchange. The tax matters section which is found in Section is IX is seemingly the "Material U.S. Federal Income Tax Considerations in Section X of this Memorandum" that is referenced on page 5 of the PPM. The lead

> in language references a general discussion that simply does not exist. There is absolutely no discussion at all.
>
> The Investor Rights Agreement, the Stockholders Agreement, a capitalization table – no information is provided and they are not even mentioned except in the exhibit headers. Obviously, no financial information is included either.
>
> Also, the PPM says nothing about a possible listing of the company, but my client has been told that the company is working on a listing and it needs to get its capital structure cleaned up in connection with that listing.
>
> When we did ask about the preferred stock, Ms. Aia Montgomery indicated that $60 million of preferred stock will be 15% of the total percentage of equity/dollar value. I have repeatedly asked for confirmation of this statement and neither Ms. Montgomery nor company counsel (Mr. Flanagan) has been forthcoming with any information or explanation or any indication that the 15% number is incorrect. We are left wondering what is going on. Further, when I asked about the preferred stock potentially being forced to convert at a value that would not even return to each preferred holder its investment amount, I was told by company counsel that that was not consistent with his understanding, but he would confirm his understanding and get back with me. I have still have not heard anything related to that.
>
> I have no idea how an investor is expected to make any sense of this offering or how the company or its counsel can reasonable [sic] think an investor has sufficient information to make an informed investment decision.
>
> So the offering itself remains a bit of mystery. On top of that, we have asked about the company's right to compel a restructuring or a withdrawal as stated in the account notice that was provided. No explanation has been provided and instead we have been lead [sic] to believe that the company is content going into default under my client's investor agreement because litigation is expensive and, for that reason, they don't expect an investor to pursue litigation. With regard to the threatened of withdrawal status and its impact on my client, the only details that we have seen related to the impact of "withdrawal status" is the information at item #3 below– so basically no information has been provided. Instead it seems like the company is more interested in forcing my client into making a decision on inadequate and incomplete information and under the threat of a default. The company's approach is made even more interesting given that the company has over $19 million in cash as of the end of September and clearly can afford to pay its obligations under my client's investor agreement, but it just does not want to. From where I sit, this all smacks of bad faith and fraud related to the money taken from my client in May 2022, but I hope that I am wrong and that I simply don't have a full picture of what is going on.

In this email, the attorney also attached a letter, which included the following

passage:

> We believe that the Company's conduct in this matter is malicious, oppressive and fraudulent and that the Company has elected to proceed with conscious disregard of the rights of our client. Further, we believe that the Company has (i) acted in a manner to defraud our client and (ii) through the private placement memorandum and other communications to our client, has made false statements of a material fact or omit to state such material fact necessary to make the statements made be not misleading. Therefore, we believe that Company's conduct will support claims for recovery of attorneys' fees and punitive damages.

156. On information and belief, notwithstanding all of the issues repeatedly raised by the attorney for investor C. Poland regarding the Offering Documents, Flanagan continued to prepare the Offering Documents in the same manner as he had been doing and did not advise INR as to what it should do with respect to the PPM or with respect to how information should be conveyed to investors.

**8. <u>Flanagan Anticipates Investors Retaining Counsel and Initiating Litigation.</u>**

157. On or about October 13, 2022, Flanagan had the following text-message exchange with Everage:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

10/13/2022 11:54 AM (Viewed 10/13/2022 11:55 AM)

Kevin - Work (7257245587)

Some of the INR investors pushed back and lawyered up?

10/13/2022 11:55 AM

Ryan's iPhone (+18504207571)

Two so far. Yes

10/13/2022 11:59 AM

Kevin - Work (7257245587)




10/13/2022 11:59 AM

Ryan's iPhone (+18504207571)

Lol

10/13/2022 11:59 AM

Ryan's iPhone (+18504207571)

Was it not expected?

10/13/2022 12:00 PM

Kevin - Work (7257245587)

When Mike's strategy is "take this new shit or fuck off"? Totally expected

On information and belief, at the time of this exchange, Flanagan, as evidenced by his rhetorical question, "Was it not expected?", was aware that there was something wrong with INR and how it handled its investors.

**9. Flanagan Reviews Investors' Attorneys' Fraud-Related Allegations Against INR.**

158. On information and belief, over the course of Murchison's representation of INR, Flanagan received and reviewed a number of documents from attorneys representing investors who alleged that INR had engaged in various forms of fraudulent conduct in connection with the solicitation of investors. On information and belief, notwithstanding the number of such occurrences brought to Flanagan's attention by attorneys, Flanagan did not even perform a cursory

investigation of these fraud-related allegations, which would have informed him that INR had been engaged in fraudulent conduct.

**(a) *Investor B. Budd.***

159. On or about October 19, 2022, an attorney representing investor B. Budd sent an email to Flanagan, which attached a demand for arbitration. The demand for arbitration set forth a number of allegations that called into question whether INR was perpetrating a fraudulent scheme. Those allegations included the following:

> Ostensibly, the money INR was raising was to be used for the build out of a large cannabis grow facility in Adelanto, California. In reality, Claimant is informed and believes, and thereon alleges that her (and other investors') funds were used to pay income and distributions to INR's investors to keep a 'Ponzi like' scheme going, which allowed Respondent INR to give the appearance [sic] a profitable enterprise, paying distributions from operations to investors, which allowed them to solicit more purchases.
>
> …
>
> These misrepresentations included those regarding INR's supposed ownership of the Las Vegas and Adelanto operations, both of which Mr. Bergmann told Mr. Budd were owned 100% by INR. This was false.
>
> INR represented to Ms. Budd that the distributions she was receiving came from the profitable operations of INR's business. In fact, some, or all, of the distributions were coming from funds raised from other investors. This was not disclosed, and Claimant would never have invested had she been told the truth.
>
> INR represented that the funds they were raising would be used to build out the Adelanto facility. In fact they were used to pay distributions to investors in the hopes of inducing them to make further investments.
>
> INR represented that their Las Vegas facility generated revenues of $18 million per year. In fact, the facility was owned by a third party, and the implication that the $18 million generated was due and payable to INR was materially misleading.

On information and belief, Flanagan reviewed investor B. Budd's demand for arbitration (Flanagan's recorded billing entry on October 19, 2022, stated, "Review arbitration demand") and then worked with Dickinson Wright on developing a litigation/arbitration strategy. Yet, on information and belief, Flanagan never

further investigated whether the allegations of INR operating a "Ponzi-like" scheme were credible.

**(b) *The Stunt Investors.***

160. On or about November 3, 2022, the attorney who had been representing investor B. Budd and was now representing another group of investors consisting of movie stuntpeople (the "Stunt Investors") sent an email to Irvine, which attached another demand for arbitration, this time on behalf of the Stunt Investors. The Stunt Investors' demand for arbitration mirrored many of the allegations made in investor B. Budd's demand for arbitration, including that INR was operating "a 'Ponzi like' scheme."

161. On information and belief, shortly after receiving the November 3, 2022, email from the investor for the Stunt Investors, Irvine informed Flanagan about the Stunt Investors' demand for arbitration, and Flanagan reviewed the demand (Flanagan's recorded billing entry on November 7, 2022, stated, "review arbitration demand"). And on or about November 10, 2022, Irvine sent an email to Garcia and Flanagan, in which he stated that the attorney for investor B. Budd and the Stunt Investors "is a competent, smart attorney, and I think he would do a good job prosecuting each arbitration."

**(c) *Investor Renacer Entertainment, Inc.***

162. On or about November 3, 2022, an attorney for investor Renacer Entertainment, Inc. ("Renacer") sent a letter to Flanagan via email, in which the attorney laid out a number of fraud-related allegations against INR, including the following:

> INR falsely claimed that it was the owner of numerous cultivation facilities, that it was generating significant revenues, that it was expanding, that it was using the funds for capital expenditures on facilities owned by it, and, most importantly, that it was in a good position to make consecutive monthly payments. INR knew that the representations were not true but made them in the course and for the purpose of soliciting an investment from REI and to induce REI to consent to the Agreements. REI relied on INR's representations to REI's detriment.

> …
>
> As part of REI's ongoing investigation, it has reason to suspect, in part, that INR does not maintain a license with the Nevada Cannabis Compliance Board, that INR has not obtained the proper cannabis licenses in Nevada or California to conduct business as its purports; that INR is not properly licensed as a business in Nevada with the Nevada Secretary of State; and, that INR does not possess the proper Clark County Business Licenses to conduct its business. Such conduct, upon verification, coupled with INR's breach would be indicative of deceptive trade practices under Nevada law and would subject INR and potentially its officers, executives, and directors to additional monetary damages.

On information and belief, Flanagan reviewed the letter from Renacer's attorney but did not take any further action.

163. On information and belief, the attorney for Renacer and Irvine, on behalf of INR, engaged in settlement discussions thereafter but no settlement was reached. Then, on or about February 9, 2023, Renacer's attorney informed Irvine by email that Renacer intended to file an action against INR in state court, attaching a copy of a draft complaint against INR. The draft complaint made various fraud-related allegations, including the following:

> Upon information and belief, at Defendants direction and approval in the written materials referred to herein, INR and its agents made misrepresentations, false projections of sales, revenues, profits, third-party contracts, projected growth, projected revenue, and claims that an investment in INR will continue to grow exponentially.
>
> These misrepresentations include, but are not limited to, INR's promise that it could offer an investment opportunity equal to a 3.3 x return on the investors positions; it had strong financial performance and high profit margins along with manufacturing to distribution capabilities that allowed INR control of the supply chain; INR had cultivation and manufacturing locations in Nevada, California, and Oklahoma with revenue as follows: accounted revenues—2017 of $14,906,439; 2018 of $15,197,285; 2019 of $15,329,165; 2020 of $17,188,863 and projected revenues—2021 of $28,833,420; 2022 of $48,083,380; 2023 of $48,000,000; 2024 of $54,000,000; that INR had cultivation and manufacturing EBITDA as follows: accounted—2017 of $8,483,056; 2018 of $8,631,820; 2019 of $8,735,933; 2020 $9,781,181 and projected—2021 of $15,859,967; 2022 of $24,654,766; 2023 of $26,839,980; 2024 of $30,311,580; that INR had retail distribution revenue as follows: accounted revenues—2017 of $10,673,415; 2018 of $14,304,646; 2019 of $22,882,070; 2020 of $33,116,868 and projected revenues—2021 of $54,750,000; 2022 of $82,500,000; 2023 of $118,500,000; 2024 of $154,500,000; that INR had retail distribution EBITDA as follows: accounted—2017 of

> $2,186,412; 2018 of $1,751,156; 2019 of $5,240,392; 2020 of $9,304,409 and projected—2021 of $12,740,718; 2022 of $14,590,932; 2023 of $29,484,788; 2024 of $44,350,664; that INR owned and operated its Las Vegas Facility; Defendants obtained an Ultra-Modern 150K Square-Foot Cannabis Facility; that INR lawfully operated in Oklahoma; that INR's investment fund project scope and budget was $37.5 million inclusive of 10% over-run and potential inflationary costs of equipment; that INR is an experienced cannabis grower with a systematic laboratory level in place in its Las Vegas facility that consistently generated $18 million annual revenue; that Defendants Williams, Bergmann, Garcia, Gerarg, Konig, Benton, Rilling, Nash, Lavego, INR's directors, officers, and core principals have significant experience in the cannabis industry, significant relationships in the cannabis industry, and well established reputations and good will in the Nevada, California, and Oklahoma cannabis industries all of which is responsible for INR's success and makes INR financially profitable, a stable investment, with rewarding returns; that INR entered the cannabis market in 2010 and holds equity positions in 24 cannabis dispensaries throughout Nevada and California that produce consistent positive cash flow regardless of key indexes or market activity; that an investment term with INR was for five years equal to 60 consecutive months with payments dispersed on the 15th of every month, and other allegations contained herein; that INR would provide accurate accounting statements monthly that accurately indicated INR's financial obligations, revenues, debts, credit, assets, sales, profit.
>
> …
>
> Defendants violated the Nevada Deceptive Trade Practice Act by making misrepresentations and concealing material facts about, but not limited to, Defendants' required state, county or city licenses, unique products, manufacturing, industry relationships, land holdings, equipment, sales, revenues, profits, third-party contracts, projected growth, projected revenue, training and experience, good will, in addition to the allegations described with specificity in ¶¶ 34-129 and 155-170.

164. Later that day, Irvine forwarded that email from Renacer's attorney, along with the draft complaint, to Flanagan. On information and belief, Flanagan reviewed the draft complaint (Flanagan's recorded billing entry on February 9, 2023, stated, "Review arbitration demands") but declined to investigate any of the allegations raised therein and instead worked with INR to propose an offer to Renacer that would stop the complaint from getting filed.

**(d) *The Frlekin Investors.***

165. On or about November 21, 2022, an attorney for investors Crystal Sunrise, Inc. and D., S., M., and E. Frlekin (the "Frlekin Investors") sent an email

to Flanagan, in which he attached a demand for arbitration. This demand for arbitration included the following allegation concerning a blatantly obvious misrepresentation made by INR in the PPM:

> In addition to their breach of contract, Respondents are also defrauding the public regarding their outstanding debt to Claimants and other material ways. In INR's private placement memorandum ("PPM") provided to potential investors, Respondents stated that their total "outstanding consolidated debt" is approximately $649,828.00. At the same time Respondents published their PPM, Respondents also provided Claimants with an "Investors' Rights Agreement" stating that Crystal, [D. Frlekin] and [S. Frlekin] collectively had outstanding loans totaling over $2 million—a number that was also incorrect, as Claimants collectively loaned a total of about $3.3 million to Respondents as of September 2022. Claimants accordingly make this demand for arbitration to prevent Respondents from proceeding with their IPO based on false pretenses and to seek recovery of payments owed to them under the contracts, as well as seeking all other appropriate legal and equitable relief.

On information and belief, Flanagan reviewed the demand for arbitration (Flanagan's recorded billing entry on November 23, 2022, stated "Review arb. demand") but did not take any further actions.

**10. Flanagan Becomes Aware of the "Sweetheart" Deals that INR Often Made to Investors.**

166. On information and belief, Flanagan was aware that INR would and could consistently persuade investors to take an action preferable to INR (e.g., converting their debt into equity, declining to proceed with litigation, or no longer asking questions) by adding very investor-preferential terms to any potential offer or resolution. On information and belief, Flanagan not only communicated the terms of these "sweetheart" deals to investors on behalf of INR, but also attempted to persuade these investors to take the deal by parroting statements made by Garcia or Bovee.

**(a) *The Frlekin Investors.***

167. On or about October 26, 2022, Flanagan sent an email to the attorneys for the Frlekin Investors, in which he communicated the following settlement offer on behalf of INR:

> I have spoken to Mike Garcia, CEO of Integrated National Resources, Inc. and because of the collective amount your clients have trusted and invested with INR, he has authorized me to offer 1,000 shares of Class A preferred Stock (valued at $1,000,000.00) as a company incentive for participating in the conversion of your clients prior contracts. The 1,000 shares can be divided up between your clients' accounts or it can be held in one account as your clients see fit.
>
> For clarity, the 1,000 shares will be on top of the dollar for dollar total conversion of all of your clients prior contracts.

On information and belief, INR believed that the total amount of Frlekin Investors' investments was approximately $2 million, which means that INR was offering a 50% increase in value to the Frlekin Investors for agreeing to the debt-to-equity transaction.

**(b) *Investor P. Dale.***

168. On or about October 28, 2022, in response to receiving the Offering Documents from Flanagan, investor P. Dale sent the following email to Flanagan:

> INR wishes for me to negotiate, however they could make a small payment of $39,000 by the 10-28-22. How can I trust them with $1,339,000?
>
> Before I waste the courts time, I wish to show all parties involved that I explored all my options to solve our disagreement.
>
> I am exploring item #2 on Ryan's List if getting shares for the interest I will be losing under my current agreement.
>
> Although I would like the following sent by email I am WILLING TO SPEAK DIRECTLY WITH MIKE:
>
> 1. Current valuation of INR and projected value of INR
>
> 2. Upping the dividend to 16% payable on the valuation. As the valuation increases, will my dividend increase?
>
> 3. In the contract I wish the dividend to be paid on the same date every year.
>
> 4. I will be given shares equivalent to the amount of interest and profit from Adelanto 2 I will lose over the next 5 years. Please share the amount of shares I will receive.
>
> 5. Possibility of being given a combination of Preferred and common shares if I wish.

> 6. Is West Coast (dispensaries) inc, INR (growth facilities), and products prepared for brands part of this business- I need to know details of all methods which the PPO is making a profit 7. All detailed financials- I am allowed to ask for them under my current agreement, but need these numbers for the PPO as well.
>
> 8. How many dispensaries and grow facilities are owned?
>
> 9. Other questions that may arise.
>
> 10. I was sent 4 different documents, I need to see ALL current versions that need to be signed per my Atrorney [sic].

In response, on or about November 1, 2022, rather than addressing investor P. Dale's questions or requests, Flanagan sent an email to investor P. Dale, stating the following:

> I have spoken with Mike Garcia, the CEO of INR and the company is willing to give you an additional 500 preferred stock shares (Valued at $500,000.00) for your participation in PPO. I'm attaching the agreements for your review. The amount of dividends is set for the entire class A shares and cannot be changed for one individual account nor can the dividend be dispersed twice a year for you alone. However, the large amount of the increase in shares should compensate you for the requested increase in dividends.

In response, investor P. Dale did not accept Flanagan's offer and instead then laid out a series of additional questions in an email for Flanagan.

169. On information and belief, Flanagan and investor P. Dale continued to communicate with each other, and then on or about December 12, 2022, Flanagan sent an email to investor P. Dale, in which he attached a stock repurchase agreement, which required INR to repurchase investor P. Dale's shares at the end of a term while allowing the investor to receive dividends during that term. In that email, Flanagan then communicated the following:

> I have spoken with the Company and they fully intend to pay the first years divided [sic] by November 2023. However, the Company's SEC Securities attorney advised the company that it would be committing fraud to the other investors if the Company entered into an agreement that guarantee of dividends [sic] for one investor at the expense of the other shareholders.

On information and belief, investor P. Dale did not agree to the stock repurchase

agreement, and he and Flanagan continued to communicate with each other on a resolution.

170. Then, on or about January 17, 2023, Flanagan made the following new offer to investor P. Dale: "The company has authorized me to make you the below offer. 1. $250,000 at signing[,] 2. 5,000 common stock[,] 3. 1,000 preferred stock." In response, on or about January 18, 2023, investor P. Dale made the following counteroffer: "1. 4000 common shares[,] 2. 4000 preferred shares[,] 3. INR agrees to buy all 4000 preferred shares in 5 years for $500 per share or at the current valuation-whichever is higher." On or about January 19, 2023, Flanagan informed investor P. Dale that INR accepted his counteroffer.

**(c) *Investor Time Horizon Capital, LLC.***

171. On or about October 3, 2022, Flanagan emailed a set of the Offering Documents to investor Time Horizon Capital, LLC. Under the proposed Investors' Rights Agreement for this investor, the "loan amount" (i.e., how much money this investor had contributed to INR) was stated as $201,843.11, and no "company incentive" (i.e., how much additional value INR was crediting to this investor on its investment) was included. On information and belief, the investor did not sign this set of the Offering Documents.

172. On or about November 14, 2022, Bovee sent an email to Flanagan, asking him, "Hey can you draw up an agreement for 1 million preferred shares for [J. Gray]/Time Horizon Capital?" In response, Flanagan sent a new set of the Offering Documents for investor Time Horizon Capital, LLC to Bovee that same day. In the new version of the Investors' Rights Agreement, a "company incentive" of $798,156.89 was added (such that the total of the "loan amount" and "company incentive" equaled $1 million).

**(d) *Investor C. Guerrero.***

173. On or about October 9, 2022, Flanagan emailed a set of the Offering Documents to investor C. Guerrero. Under the proposed Investors' Rights



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

Agreement for this investor, the "loan amount" (i.e., how much money this investor had contributed to INR) was stated as $567,900, and the "company incentive" (i.e., how much additional value INR was crediting to this investor on his investment) was stated as $100.

174. Investor C. Guerrero did not agree to the terms presented in the Offering Documents originally provided by Flanagan and, after receiving at least one additional proposal from Flanagan, informed Flanagan that "I am ready to sign … to what's fair." In response, Flanagan emailed a new set of the Offering Documents to investor C. Guerrero, whereby the new version of the Investors' Rights Agreement increased the "company incentive" to $817,100 (such that the total of the "loan amount" and "company incentive" equaled $1,385,000).

175. On information and belief, Flanagan chose not to question how it made financial sense for INR to offer such seemingly sweetheart deals to investors and was aware that INR was making such offers to ensure that investors would immediately sign the agreements and stop bothering INR.

### 11. **Flanagan Learned that INR Wanted to Provide Investors with Inaccurate Financial Projections.**

176. On information and belief, in or about December 2022, Garcia informed Flanagan that he wanted INR to provide investors with financial projections, which may not be accurate. In response, on or about December 21, 2022, Flanagan sent an email to Garcia, stating the following:

> The legal standard for a company's pitch deck or any internal company evaluation is "reasonable belief". What this means is the Company must have a reasonable belief they can meet the numbers. It is a misrepresentation and possibly fraud to pull numbers that "look good" with no reasonable foundation for the company to obtain those numbers. Reasonable belief can be founded in a market evaluation done by someone who holds licenses. As CEO I would recommend getting an evaluation letter to back up the numbers. The letter should contain some detail as to how those numbers are met from year to year. If the letter's evaluation of how the numbers are met seem reasonable to you then the legal standard is met. However, just the numbers alone without any explanation to how the numbers are met is

below the legal standard of reasonable belief and misrepresentation/fraud claims could be brought against the company.

On information and belief, from these communications, Flanagan was aware that INR had prepared financial projections that were not accurate, advising them not to do so, but declined to further investigate the financial condition of INR.

**12. <u>Flanagan Understood that INR's Personnel Used Aliases.</u>**

177. On information and belief, throughout Murchison's representation of INR, Flanagan was aware that Garcia sometimes used the name "Mike Von Kaiser" when dealing with third parties, including in connection with construction projects at the property where Garcia resided, and Flanagan was also aware that Bovee used the name "Aia Montgomery" in connection with her work for INR. On information and belief, Flanagan was also aware that investors could not find any information about the Scheme Principals on the internet, as if they did not exist. Yet, on information and belief, Flanagan elected not to discuss this issue with INR.

**J. Investor Losses from the Scheme.**

178. Investors paid approximately $62.8 million into the Scheme in the aggregate, and those funds were primarily used to pay existing investors and to personally enrich the Scheme Principals and others. Investors who paid money into the Scheme have collectively suffered net losses (calculated on a money-in, money-out basis) totaling approximately $44.7 million. On information and belief, for the losing investors who originally paid money into the Scheme no earlier than September 4, 2022 (i.e., the date that the Offering Documents were first disseminated to investors), their net losses totaled approximately $21.1 million.

179. Murchison's role in the Scheme, including by preparing and disseminating the Offering Documents to investors on behalf of INR, allowed the Scheme to continue on unabated and, as a result, caused deeper investor losses therefrom.

180. On information and belief, some investors who received the Offering Documents—who were either new investors (that had not yet contributed funds to INR) or existing investors (that had previously contributed funds to INR)—were, in reliance of the Offering Documents, persuaded to invest new funds into INR. On information and belief, these investors were convinced to invest due, in part, to the Offering Documents as they were professionally prepared by a well-established and reputable law firm and looked like real, legitimate legal documents, and certain of those investors were also persuaded by reassurances made by Flanagan that INR's offering was legitimate.

181. On information and belief, many of the existing investors who received the Offering Documents had agreed to sign the Offering Documents and forego receiving their monthly payments from INR under the Original Investor Agreements, easing INR's liquidity issues (the primary issues for which INR originally sought out counsel). On information and belief, with INR's liquidity issues temporarily paused, the Scheme Principals were able to shift their attention back to soliciting new investors and securing more funds therefrom. In other words, on information and belief, had Murchison not been involved in handling INR's existing investors and working with them to sign the Offering Documents, INR would have been unable to keep the investors at bay, and those investors would have then made more demands for their monthly payments under the Original Investor Agreements, thereby overwhelming INR and forcing an earlier collapse of the Scheme. Instead, Murchison's involvement gave the Scheme Principals the time and breathing room they needed to extract tens of millions of dollars more from new investors from the fall of 2022 to the spring of 2023 when the Scheme ultimately collapsed.

**K. Payments Received by Murchison and Flanagan.**

182. Following the close of a calendar month, Murchison's accounting department generated a pre-bill for the INR matter and circulated that pre-bill to

Flanagan for his review and approval. A pre-bill contained the billing entries recorded by Flanagan and other Murchison timekeepers for the work that they performed on the INR matter over the preceding month. On information and belief, pursuant to Murchison's established policies and procedures, the firm's accounting department should have also circulated the pre-bills to a Murchison senior partner for review, but they were not. In other words, on information and belief, Flanagan was the only Murchison attorney who reviewed the pre-bills for the INR matter, and Nunez (a senior partner) and Rasmussen (a partner), who were both aware of the INR matter, never requested to review those pre-bills.

183. After Flanagan reviewed a pre-bill, he sent the pre-bill back to Murchison's accounting department indicating his approval. And once the accounting department received Flanagan's approval, Murchison would then send out an invoice to INR. On information and belief, over the course of Murchison's representation of INR, Murchison sent out the following eleven invoices to INR:

| No. | Invoice No. | Invoice Date | Fees & Expenses |
|---|---|---|---|
| 1 | 24288622 | 07/22/2022 | $8,812.50 |
| 2 | 24290235 | 08/30/2022 | $8,925.00 |
| 3 | 24291488 | 09/29/2022 | $17,321.70 |
| 4 | 24291778 | 10/18/2022 | $64,467.71 |
| 5 | 24293028 | 11/10/2022 | $53,824.58 |
| 6 | 24294531 | 12/12/2022 | $27,937.50 |
| 7 | 24295886 | 01/17/2023 | $32,962.50 |
| 8 | 24297273 | 02/17/2023 | $35,424.43 |
| 9 | 24298947 | 03/30/2023 | $41,737.50 |
| 10 | 24300071 | 04/25/2023 | $42,159.91 |
| 11 | 24300447 | 05/09/2023 | $1,125.00 |

On information and belief, Murchison altogether billed $334,698.33 in fees and expenses to INR.

184. On account of the legal services performed by the firm for INR, Murchison received at least fifteen payments from the Receivership Entities totaling no less than $302,006.08. More specifically, Murchison received the following payments in connection with the INR matter:

| No. | Date | Payor | Amount |
|---|---|---|---|
| 1 | 05/27/2022 | Total Solution Construction LLC | $3,500.00 |
| 2 | 05/31/2022 | Integrated National Resources, Inc. | $10,000.00 |
| 3 | 08/31/2022 | Integrated National Resources, Inc. | $7,737.50 |
| 4 | 09/01/2022 | Total Solution Construction LLC | $3,730.00 |
| 5 | 09/29/2022 | Integrated National Resources, Inc. | $17,321.70 |
| 6 | 10/07/2022 | Integrated National Resources, Inc. | $64,000.00 |
| 7 | 11/10/2022 | Integrated National Resources, Inc. | $54,292.29 |
| 8 | 12/09/2022 | Integrated National Resources, Inc. | $28,000.00 |
| 9 | 01/17/2023 | Integrated National Resources, Inc. | $32,900.00 |
| 10 | 01/23/2023 | Bagpipe Multimedia LLC | $1,415.00 |
| 11 | 02/21/2023 | INR Consulting LLC | $35,424.43 |
| 12 | 03/01/2023 | Bagpipe Multimedia LLC | $1,410.00 |
| 13 | 04/28/2023 | INR Consulting LLC | $40,670.16 |
| 14 | 05/03/2023 | Bagpipe Multimedia LLC | $480.00 |
| 15 | 05/12/2023 | INR Consulting LLC | $1,125.00 |

185. On information and belief, Murchison was aware of the kinds of legal services that Flanagan was performing for INR based on his recorded billing entries that were reflected in the firm's pre-bills and invoices for the INR matter. Such billing entries by Flanagan for the INR matter include the following:

- "Correspond with client and associated counsel re: INR legal strategy" (2.0 hours, May 24, 2022);
- "Analyze draft corporate documents provided by associated counsel" (2.0 hours, June 16, 2022);

- "Analyze PPM and Articles of Incorporation re: client legal strategies" (3.0 hours, June 23, 2022);
- "Review loan documents" (1.0 hours, July 6, 2022);
- "Compose Notice of Default" (3.0 hours, July 7, 2022);
- "Legal research re: press release; corresponded with associated counsel re: same" (1.5 hours, July 7, 2022);
- "Coordinated with client and broker re: marketing strategies" (2.0 hours, August 4, 2022);
- "Review corporate auditors guideline needed for OTC offering, pursuant to client's requests" (1.5 hours, August 9, 2022);
- "Discussed corporate documents with clients and review client provided notes on current investors" (2.0 hours, August 10, 2022);
- "Draft non disclosure agreement for outside parties" (2.0 hours, August 12, 2022);
- "Revised corporate documents in accordance with company feedback" (4.0 hours, August 14, 2022);
- "Reviewed PPM and other corporate documents with associated counsel" (3.0 hours, September 3, 2022);
- "Finalized Company contracts and sent Contracts to client" (2.6 hours, September 4, 2022);
- "Corresponded with client re: secured loan agreement; drafted notice of default re: same" (1.5 hours, September 6, 2022);
- "Draft notice of account suspension; corresponded with client re: same" (1.5 hours, September 14, 2022);
- "Met with opposing party re: default on loan; corresponded with client re: same" (1.5 hours, September 16, 2022);
- "Corresponded with associated counsel re: SEC filings; composed draft for filings; communicated same with client" (3.0 hours, September 19, 2022);

- “Composed Company Conversion Approval document” (1.0 hours, September 20, 2022);
- “Reviewed documents provided by opposing party re: loan default” (1.0 hours, September 20, 2022);
- “Composed common stock conversion for Company clients. (Five clients)” (2.2 hours, September 21, 2022);
- “Finalize Corporate contracts; corresponded with associated counsel re: SEC filings; corresponded with client re: same” (5.0 hours, September 22, 2022);
- “Compose Promissory Note” (2.0 hours, September 22, 2022);
- “Analyzed and researched client proved prospectus” (2.0 hours, September 23, 2022);
- “Compose Cease and Desist notices” (2.5 hours, September 27, 2022);
- “Compiled data for SEC filings. Corresponded with associated counsel re: same” (2.5 hours, September 28, 2022);
- “Composed notice of suspension due to breach of NDA” (1.0 hours, September 29, 2022);
- “Compose notices to Company's clients re: Account in Withdrawal status” (3.0 hours, September 30, 2022);
- “Revise board resolutions” (1.6 hours, October 3, 2022);
- “Update Stockholders agreements with board resolution” (1.3 hours, October 3, 2022);
- “Review arbitration demand. Communicate with client re: same” (1.5 hours, October 19, 2022);
- “Toured potential cannabis warehouse with client; coordinated with client and sellers re: same” (2.6 hours, November 3, 2022);
- “Settlement negotiations with clients and opposing counsel; coordinated with client re: same” (4.6 hours, November 4, 2022);
- “Meeting to discuss investor claims” (1.3 hours, November 18, 2022);

- "Draft LOI for purchase of OK Cannabis License" (2.3 hours, December 6, 2022);
- "Negotiate with investors; draft corporate contracts; coordinate with client re: same" (4.1 hours, December 7, 2022);
- "Meeting with corporate securities counsel with DW; reviewed company prospectus; drafted corporate contracts; coordinated with client re: same" (4.6 hours, December 20, 2022);
- "Drafted Purchase and sell agreement for OK cannabis licenses" (3.2 hours, December 21, 2022);
- "Draft Letter of Intent for NM expansion" (2.3 hours, December 28, 2022);
- "Review Plans and Permit for OK Facility" (1.6 hours, January 3, 2023);
- "Composed Common Stock option agreement" (3.9 hours, January 17, 2023);
- "Draft corporate withdrawal agreement and contracts. Coordinate with client re: same" (5.6 hours, January 20, 2023);
- "Review Bank information re: BOA closing accounts" (1.3 hours, January 25, 2023);
- "Revised Stunt disclosure documents; coordinated with client and co-counsel re: same; composed corporate contracts" (4.5 hours, February 8, 2023);
- "Draft demand letter for Wells Fargo" (2.3 hours, March 1, 2023).

186. On information and belief, Murchison was also aware of how much Flanagan was working on the INR matter. Over the roughly one-year period of Murchison's representation of INR, Flanagan billed approximately 848.3 hours to the INR matter. On information and belief, in numerous months, Flanagan's billed time for the INR matter in a month represented nearly half or more of the 160 hours that a Murchison associate was expected to bill in a month, including in September 2022 (153.6 hours), October 2022 (131.2 hours), November 2022

(74.5 hours), December 2022 (87.9 hours), January 2023 (94.4 hours), February 2023 (111.3 hours), and March 2023 (106.2 hours).

187. On information and belief, not only did Murchison know about the variety and extent of the legal services that Flanagan was performing for INR from the prebills and invoices, but the firm also knew from those documents that (a) Flanagan was regularly performing legal services in specialized areas, including securities transactions, that he was not qualified in, and (b) Flanagan, a junior associate, was performing those services without the supervision or oversight of a Murchison partner (as evidenced by the lack of any billing entries recorded by a partner). Nevertheless, on information and belief, Murchison allowed a completely unqualified and unsupervised junior associate to perform work under the firm's name, sending invoices for such work to INR and accepting payments from INR over a one-year period.

188. In addition, on information and belief, not only did Murchison benefit from the work performed by Flanagan for INR (receiving several hundred thousand dollars in fees), but the firm actually rewarded Flanagan by approving and paying him quarterly referral fees equal to 10% of the fees collected on the INR matter. On information and belief, Murchison paid referral fees to Flanagan totaling tens of thousands of dollars.

189. On information and belief, the referral fees could not have been paid to Flanagan without the prior approval of Longo, Murchison's managing partner, who, each quarter, would review and approve a report listing out all of the matters in which a Murchison attorney is entitled to receive referral fees for the quarter. On information and belief, Longo, by approving the reports that included the referral fees proposed to be paid to Flanagan, approved and authorized Murchison's payment of those referral fees to Flanagan.

190. Flanagan also regularly received transfers of money from Bagpipe Holdings, LLC ("Bagpipe Holdings"), one of the Receivership Entities, which was

controlled by Garcia. More specifically, these transfers, which took place between May 2022 and April 2023 and totaled $35,000, were made via PayPal from an account belonging to Bagpipe Holdings to an account belonging to Flanagan personally. Sometimes when these PayPal transfers were made, notes were included to describe (whether accurately or not) the purpose of the transfer. The dates and amounts of the PayPal transfers received by Flanagan from Bagpipe Holdings, as well as the accompanying notes, are as follows:

| No. | Date | Amount | Notes |
|---|---|---|---|
| 1 | 05/03/2022 | $1,500.00 | |
| 2 | 05/04/2022 | $500.00 | Review |
| 3 | 05/05/2022 | $500.00 | Dinner and drinks |
| 4 | 05/09/2022 | $1,000.00 | Week of the 9th - 13th |
| 5 | 05/12/2022 | $1,000.00 | Happy bonus |
| 6 | 05/13/2022 | $500.00 | Have a good weekend |
| 7 | 05/16/2022 | $1,000.00 | Proceed |
| 8 | 05/17/2022 | $1,000.00 | Shopping |
| 9 | 05/24/2022 | $1,000.00 | Thank you |
| 10 | 05/26/2022 | $500.00 | |
| 11 | 06/13/2022 | $500.00 | Week |
| 12 | 06/18/2022 | $500.00 | Saturday |
| 13 | 06/30/2022 | $500.00 | Breakfast for efforts |
| 14 | 07/13/2022 | $500.00 | Seeking bonus |
| 15 | 07/22/2022 | $1,000.00 | Suit |
| 16 | 07/26/2022 | $1,000.00 | Anniversary |
| 17 | 08/13/2022 | $1,000.00 | Advice |
| 18 | 08/15/2022 | $500.00 | Lunch and drinks |
| 19 | 08/15/2022 | $1,000.00 | Travel |
| 20 | 08/24/2022 | $2,500.00 | Whatever |

| | | | |
|---|---|---|---|
| 21 | 09/29/2022 | $1,000.00 | Bonus |
| 22 | 10/01/2022 | $500.00 | Contract |
| 23 | 10/13/2022 | $1,500.00 | Corp |
| 24 | 11/02/2022 | $500.00 | Coffee |
| 25 | 11/14/2022 | $1,000.00 | Atty |
| 26 | 11/20/2022 | $500.00 | Victoria secrets Sunday |
| 27 | 11/23/2022 | $1,000.00 | Changes |
| 28 | 12/07/2022 | $500.00 | Temperature |
| 29 | 12/16/2022 | $500.00 | Letter |
| 30 | 12/21/2022 | $500.00 | Pastries |
| 31 | 01/20/2023 | $1,000.00 | Shoes |
| 32 | 02/02/2023 | $1,000.00 | Shades |
| 33 | 02/09/2023 | $1,000.00 | Pastries |
| 34 | 02/17/2023 | $1,000.00 | Contract |
| 35 | 03/04/2023 | $1,000.00 | Brisket and Pan |
| 36 | 03/23/2023 | $1,500.00 | Documents |
| 37 | 03/31/2023 | $1,500.00 | Congratulations |
| 38 | 04/05/2023 | $1,000.00 | Review of docs |
| 39 | 04/16/2023 | $1,000.00 | Updated B |

On information and belief, Flanagan accepted these bribes from INR in exchange for ignoring his professional obligations to INR as a client, disregarding numerous red flags regarding the INR investment scheme, allowing Murchison's name and reputation to be used to legitimize the scheme, and agreeing to simply do as Garcia requested without regard for the potential harm to investors.

191. In addition, on information and belief, on or about March 2, 2023, Flanagan lied directly to a contractor, directing him to send a refund payment for work on Garcia's residence via Zelle to Flanagan's personal bank account, having provided the contractor with Flanagan's personal phone number and falsely

informing the contractor that that phone number belonged to "Mike Von Kaiser" (an alias he knew Garcia used).

## V. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(For Aiding and Abetting Breach of Fiduciary Duty)**

**(Against Murchison & Cumming, LLP)**

192. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 191, inclusive, as set forth above.

193. At all relevant times, Garcia was one of the principals that controlled the Receivership Entities. As such, Garcia owed fiduciary duties of care, loyalty, and good faith to the Receivership Entities. Garcia's fiduciary duties included, among other things, exercising good business judgment, acting prudently in the operation of the Receivership Entities' business, discharging his actions in good faith, acting in the best interests of the Receivership Entities, and putting the interests of the Receivership Entities before his own.

194. Garcia breached his fiduciary duties to the Receivership Entities by, among other things, (a) causing the Receivership Entities to enter into transactions with and accepting funds from investors in connection with the Scheme, and (b) causing the Receivership Entities to otherwise perpetrate a fraud on investors through the Scheme.

195. Murchison, through Flanagan, knew of Garcia's fiduciary duties to the Receivership Entities and knew that Garcia was breaching his fiduciary duties by engaging in the conduct described herein. Murchison's knowledge can be established from, among other things, the sheer number of red flags raised that were brought to Flanagan's attention during Murchison's representation of INR (as discussed above). These red flags include, but are not limited to: (a) the false statements made by INR about the ownership of its cannabis facilities; (b) Garcia's refusal to document important company contracts (e.g., purported leases for the

facilities), instead insisting they remain “handshake deals;” (c) the lack of any online presence for any of the Scheme Principals; (d) the lack of any online information about INR and Garcia’s suspect explanation for such absence; (e) INR’s questionable recordkeeping about investors and their investments, which led to incorrect figures being used in the Offering Documents; (f) the false and nonsensical statements in INR’s purported income statement, including its cash on hand, total debt, and absurdly high EBITDA margins; (g) accusations of INR being a “Ponzi like” scheme made by an attorney representing an investor (and other fraud-related allegations made by other attorneys for investors); (h) the issues raised by an attorney for an investor regarding the inconsistent or missing information in the PPM; (i) INR’s continued use of the Original Investor Agreements after the Offering Documents were already being drafted; (j) the “bonus” and other payments (i.e., bribes) made to Flanagan personally by Garcia, through Bagpipe Holdings, totaling $35,000; (k) Garcia’s use of the fake name or alias, Mike Von Kaiser, and Bovee’s use of the alias “Aia Montgomery” with investors; (*l*) the lack of any records showing cannabis licenses held by INR or its affiliates; and (m) Garcia’s questions about sending misleading financial projections to investors. Indeed, Flanagan’s knowledge that INR was not a legitimate operation is clear from his early text messages with Everage stating he read a news article about a Ponzi scheme in Las Vegas and was immediately worried that the story was about INR or sounded similar to INR’s own story.

196. Murchison actively participated in, provided substantial assistance to, and encouraged Garcia’s breaches of his fiduciary duties to the Receivership Entities by, among other things, (a) Murchison allowing its name and reputation to be used to legitimize the Scheme in the eyes of investors, (b) Flanagan preparing the false and misleading Offering Documents to be sent to investors and intentionally avoiding having the Offering Documents reviewed by attorneys experienced and qualified in securities law before they were sent out, (c) Flanagan

holding himself out as a representative of and vouching for INR and its business in connection with its purported restructuring of investor contracts and equity offering, and (d) Flanagan failing to correct and reciting the same misrepresentations made by Garcia to existing and prospective investors.

197. As a direct and proximate result of Murchison's conduct described herein, the Receivership Entities have suffered substantial harm, with Murchison's aiding and abetting of Garcia's breaches of his fiduciary duties to the Receivership Entities causing the Receivership Entities to, among other things, (a) be placed into receivership (where the receivership estate continues to incur significant administrative expenses) and (b) incur liabilities to those defrauded investors on account of their claims for rescission against the Receivership Entities. The amount of harm directly and proximately caused by Murchison's conduct, which will be no less than $21.1 million (representing the known investors' net losses attributable to those investors who paid money into the Scheme for the first time on or after September 4, 2022, i.e., the date that the Offering Documents were first disseminated to investors), will be proven at trial.

**<u>SECOND CLAIM FOR RELIEF</u>**

**(For Aiding and Abetting Fraud)**

**(Against Murchison & Cumming, LLP)**

198. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 197, inclusive, as set forth above.

199. The Scheme Principals, using the Receivership Entities which he controlled, perpetrated a massive fraud upon investors who invested or contributed money into the Scheme and upon the Receivership Entities themselves in connection with the Scheme.

200. Garcia, personally or through the Receivership Entities which he controlled, made false representations of material facts concerning the Scheme to and concealed material facts concerning the Scheme from investors, including,

among other things, misrepresenting that (a) the Receivership Entities operated a cannabis business, (b) the Receivership Entities owned or operated one or more cannabis facilities, and (c) the investors' money would be used to support the Receivership Entities' cannabis operations, and, in particular, their cannabis facilities.

201. Garcia knew that his representations of material facts to the investors were false when he made them and that the material facts concealed from the investors were not known by the investors, and Garcia made his false representations of material facts to and concealed material facts from the investors with the intent to defraud or deceive them, specifically with the intent of inducing them to invest or contribute their money into the Scheme.

202. The investors did not know the truth of Garcia's false representations or of the material facts concealed by him, and the investors would not have invested or contributed their money into the Scheme had the truth of the material facts been disclosed.

203. The investors reasonably relied on Garcia's false representations and concealment by entering into transactions with the Receivership Entities and investing or contributing their money into the Scheme, and the investors had no reason to believe that Garcia would defraud or deceive them because earlier investors had purportedly received the repayment of their principal and interest in connection with the Scheme. Garcia's false representations and concealment of material facts were a substantial factor in causing harm to the investors and the Receivership Entities.

204. Murchison, through Flanagan, knew of Garcia's false representations and concealment of material facts and knew that the false representations made to and material facts concealed from the investors were not known to the investors. Murchison's knowledge can be established from, among other things, the sheer number of red flags raised that were brought to Flanagan's attention during

Murchison's representation of INR (as discussed above). These red flags include, but are not limited to: (a) the false statements made by INR about the ownership of its cannabis facilities; (b) Garcia's refusal to document important company contracts (e.g., purported leases for the facilities), instead insisting they remain "handshake deals;" (c) the lack of any online presence for any of the Scheme Principals; (d) the lack of any online information about INR and Garcia's suspect explanation for such absence; (e) INR's questionable recordkeeping about investors and their investments, which led to incorrect figures being used in the Offering Documents; (f) the false and nonsensical statements in INR's purported income statement, including its cash on hand, total debt, and absurdly high EBITDA margins; (g) accusations of INR being a "Ponzi like" scheme made by an attorney representing an investor (and other fraud-related allegations made by other attorneys for investors); (h) the issues raised by an attorney for an investor regarding the inconsistent or missing information in the PPM; (i) INR's continued use of the Original Investor Agreements after the Offering Documents were already being drafted; (j) the "bonus" and other payments (i.e., bribes) made to Flanagan personally by Garcia, through Bagpipe Holdings, totaling $35,000; (k) Garcia's use of the fake name or alias, Mike Von Kaiser, and Bovee's use of the alias "Aia Montgomery" with investors; (*l*) the lack of any records showing cannabis licenses held by INR or its affiliates; and (m) Garcia's questions about sending misleading financial projections to investors. Indeed, Flanagan's knowledge that INR was not a legitimate operation is clear from his early text messages with Everage stating he read a news article about a Ponzi scheme in Las Vegas and was immediately worried that the story was about INR or sounded similar to INR's own story.

205. Murchison actively participated in, provided substantial assistance to, and encouraged the fraud perpetrated by Garcia on the Receivership Entities and investors by, among other things, (a) Murchison allowing its name and reputation to be used to legitimize the Scheme in the eyes of investors, (b) Flanagan preparing

the false and misleading Offering Documents to be sent to investors and intentionally avoiding having the Offering Documents reviewed by attorneys experienced and qualified in securities law before they were sent out, (c) Flanagan holding themselves out as representatives of and vouching for INR and its business in connection with its purported restructuring of investor contracts and equity offering, and (d) Flanagan failing to correct and reciting the same misrepresentations made by Garcia to existing and prospective investors.

206. As a direct and proximate result of Murchison's conduct described herein, the Receivership Entities have suffered substantial harm, with Murchison's aiding and abetting of Garcia's fraud causing the Receivership Entities to, among other things, (a) be placed into receivership (where the receivership estate continues to incur significant administrative expenses) and (b) incur liabilities to those defrauded investors on account of their claims for rescission against the Receivership Entities. The amount of harm directly and proximately caused by Murchison's conduct, which will be no less than $21.1 million (representing the known investors' net losses attributable to those investors who paid money into the Scheme for the first time on or after September 4, 2022, i.e., the date that the Offering Documents were first disseminated to investors), will be proven at trial.

## <u>THIRD CLAIM FOR RELIEF</u>

**(For Civil Conspiracy)**

**(Against Murchison & Cumming, LLP)**

207. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 206, inclusive, as set forth above.

208. The Scheme Principals, using the Receivership Entities which they controlled, perpetrated a massive fraud upon investors who invested or contributed money into the Scheme and upon the Receivership Entities themselves in connection with the Scheme.

209. Garcia, personally or through the Receivership Entities which he controlled, made false representations of material facts concerning the Scheme to and concealed material facts concerning the Scheme from investors, including, among other things, misrepresenting that (a) the Receivership Entities operated a cannabis business, (b) the Receivership Entities owned or operated one or more cannabis facilities, and (c) the investors' money would be used to support the Receivership Entities' cannabis operations, and, in particular, their cannabis facilities.

210. Garcia knew that his representations of material facts to the investors were false when he made them and that the material facts concealed from the investors were not known by the investors, and Garcia made his false representations of material facts to and concealed material facts from the investors with the intent to defraud or deceive them, specifically with the intent of inducing them to invest or contribute their money into the Scheme.

211. The investors did not know the truth of Garcia's false representations or of the material facts concealed by him, and the investors would not have invested or contributed their money into the Scheme had the truth of the material facts been disclosed.

212. The investors reasonably relied on Garcia's false representations and concealment by entering into transactions with the Receivership Entities and investing or contributing their money into the Scheme, and the investors had no reason to believe that Garcia would defraud or deceive them because earlier investors had purportedly received the repayment of their principal and interest in connection with the Scheme. Garcia's false representations and concealment of material facts were a substantial factor in causing harm to the investors and the Receivership Entities.

213. Murchison, through Flanagan, knew of Garcia's false representations and concealment of material facts and knew that the false representations made to



ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
ATTORNEYS AT LAW

and material facts concealed from the investors were not known to the investors. Murchison's knowledge can be established from, among other things, the sheer number of red flags raised that were brought to Flanagan's attention during Murchison's representation of INR (as discussed above). These red flags include, but are not limited to: (a) the false statements made by INR about the ownership of its cannabis facilities; (b) Garcia's refusal to document important company contracts (e.g., purported leases for the facilities), instead insisting they remain "handshake deals;" (c) the lack of any online presence for any of the Scheme Principals; (d) the lack of any online information about INR and Garcia's suspect explanation for such absence; (e) INR's questionable recordkeeping about investors and their investments, which led to incorrect figures being used in the Offering Documents; (f) the false and nonsensical statements in INR's purported income statement, including its cash on hand, total debt, and absurdly high EBITDA margins; (g) accusations of INR being a "Ponzi like" scheme made by an attorney representing an investor (and other fraud-related allegations made by other attorneys for investors); (h) the issues raised by an attorney for an investor regarding the inconsistent or missing information in the PPM; (i) INR's continued use of the Original Investor Agreements after the Offering Documents were already being drafted; (j) the "bonus" and other payments (i.e., bribes) made to Flanagan personally by Garcia, through Bagpipe Holdings, totaling $35,000; (k) Garcia's use of the fake name or alias, Mike Von Kaiser, and Bovee's use of the alias "Aia Montgomery" with investors; (*l*) the lack of any records showing cannabis licenses held by INR or its affiliates; and (m) Garcia's questions about sending misleading financial projections to investors. Indeed, Flanagan's knowledge that INR was not a legitimate operation is clear from his early text messages with Everage stating he read a news article about a Ponzi scheme in Las Vegas and was immediately worried that the story was about INR or sounded similar to INR's own story.

214. Murchison agreed and cooperated with Garcia to perpetrate the fraud on the investors and the Receivership Entities by, among other things, (a) Murchison allowing its name and reputation to be used to legitimize the Scheme in the eyes of investors, (b) Flanagan preparing the false and misleading Offering Documents to be sent to investors and intentionally avoiding having the Offering Documents reviewed by attorneys experienced and qualified in securities law before they were sent out, (c) Flanagan holding themselves out as representatives of and vouching for INR and its business in connection with its purported restructuring of investor contracts and equity offering, and (d) Flanagan failing to correct and reciting the same misrepresentations made by Garcia to existing and prospective investors.

215. As a direct and proximate result of Murchison's conduct described herein, the Receivership Entities have suffered substantial harm, with Murchison's conspiracy, agreement, and cooperation in perpetrating Garcia's fraud causing the Receivership Entities to, among other things, (a) be placed into receivership (where the receivership estate continues to incur significant administrative expenses) and (b) incur liabilities to those defrauded investors on account of their claims for rescission against the Receivership Entities. The amount of harm directly and proximately caused by Murchison's conduct, which will be no less than $21.1 million (representing the known investors' net losses attributable to those investors who paid money into the Scheme for the first time on or after September 4, 2022, i.e., the date that the Offering Documents were first disseminated to investors), will be proven at trial.

**<u>FOURTH CLAIM FOR RELIEF</u>**

**(For Malpractice)**

**(Against Murchison & Cumming, LLP)**

216. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 215, inclusive, as set forth above.

217. During Murchison's representation of certain of the Receivership Entities, Murchison, on the one hand, and those certain Receivership Entities, on the other hand, were in an attorney-client relationship, pursuant to which Murchison, as attorney, owed various duties to those certain Receivership Entities, as client, including the duty to provide competent representation.

218. Murchison breached its duties to the Receivership Entities by, among other things, (a) advising the Receivership Entities (or allowing Flanagan to advise the Receivership Entities) on matters outside of his or the firm's expertise or experience, including on securities laws matters, (b) preparing (or allowing Flanagan to prepare) the false and misleading Offering Documents to be sent to investors, without having the Offering Documents reviewed by attorneys experienced and qualified in securities law before they were sent out, and (c) failing to supervise Flanagan in or otherwise oversee his representation of the Receivership Entities.

219. As a direct and proximate result of Murchison's conduct described herein, the Receivership Entities have suffered substantial harm, with Murchison's malpractice causing the Receivership Entities to, among other things, (a) be placed into receivership (where the receivership estate continues to incur significant administrative expenses) and (b) incur liabilities to those defrauded investors on account of their claims for rescission against the Receivership Entities. The amount of harm directly and proximately caused by Murchison's conduct, which will be no less than $21.1 million (representing the known investors' net losses attributable to those investors who paid money into the Scheme for the first time on or after September 4, 2022, i.e., the date that the Offering Documents were first disseminated to investors), will be proven at trial.

/ / /

/ / /

/ / /

**FIFTH CLAIM FOR RELIEF**

**(For Avoidance and Recovery of Actual Fraudulent Transfers)**

**(Against Murchison & Cumming, LLP)**

220. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 219, inclusive, as set forth above.

221. Murchison received payments totaling no less than $302,006.08 from the Receivership Entities, either as an initial transferee or as an immediate or mediate transferee. Such payments were made from the proceeds of the Ponzi scheme which were generated from investors in the Scheme.

222. On information and belief, the Scheme Principals caused the Receivership Entities to transfer the funds to Murchison with the actual intent to hinder, delay, or defraud their creditors, including the investors in the Scheme. On information and belief, the circumstances evidencing such actual intent include the fact that the Receivership Entities were making such payments as compensation for Murchison's services in furthering the Scheme.

223. As a consequence, the Receivership Entities' transfers to Murchison constitute actual fraudulent transfers under the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, or other applicable law, and the receivership estate has been harmed as a result of such actual fraudulent transfers, and the Receiver, in her capacity as the representative of the receivership estate, is entitled to avoid such transfers and recover the property transferred or recover judgment for the value of such property transferred, with interest, which value will be proven at trial.

**SIXTH CLAIM FOR RELIEF**

**(For Avoidance and Recovery of Constructively Fraudulent Transfers)**

**(Against Murchison & Cumming, LLP)**

224. The Receiver incorporates herein each and every allegation contained in Paragraphs 1 through 223, inclusive, as set forth above.

225. Murchison received payments totaling no less than $302,006.08 from the Receivership Entities, either as an initial transferee or as an immediate or mediate transferee. Such payments were made from the proceeds of the Ponzi scheme which were generated from investors in the Scheme.

226. On information and belief, the Scheme Principals caused the Receivership Entities to transfer the funds to Murchison without receiving reasonably equivalent value in exchange therefor, and the Receivership Entities each (a) were engaged, or were about to engage, in a business or transaction for which their remaining assets were unreasonably small in relation to that business or transaction, (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due, or (c) were insolvent at the time of the transfers or became insolvent as a result of the transfers. On information and belief, the circumstances reflecting such constructive fraud include, without limitation, (y) Murchison's services being in furtherance in the Scheme, which do not constitute value, and (z) the Receivership Entities never having any revenue or income from any kind of legitimate business operations, having only received from investors investing in the Scheme.

227. As a consequence, the Receivership Entities' transfers to Murchison constitute constructively fraudulent transfers under the Uniform Voidable Transactions Act, the Uniform Fraudulent Transfer Act, or other applicable law, and the receivership estate has been harmed as a result of such constructively fraudulent transfers, and the Receiver, in her capacity as the representative of the receivership estate, is entitled to avoid such transfers and recover the property transferred or recover judgment for the value of such property transferred, with interest, which value will be proven at trial.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant, and each of them, and in favor of Plaintiff as follows:

**On the First, Second, Third, and Fourth Claims for Relief:**

1. For damages in an amount according to proof at trial, including, without limitation, compensatory, incidental, and consequential damages;

**On the Fifth and Sixth Claims for Relief:**

2. For a judgment avoiding the Receivership Entities' transfers to Defendant and recovering from Defendant the property transferred thereto;

3. For a judgment recovering from Defendant the value of the property transferred thereto;

**On All Claims for Relief:**

4. For prejudgment interest as allowed by law;

5. For recovery of costs of suit and reasonable attorneys' fees; and

6. For such other and further relief as the Court may deem proper.

Dated: June 29, 2026

ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP
DAVID R. ZARO
EDWARD G. FATES
MATTHEW D. PHAM

By: */s/ Edward G. Fates*
EDWARD G. FATES
Attorneys for Plaintiff
KRISTA FREITAG, Receiver